## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| TOWANDA SMITH, ) | |
| ) | |
| Plaintiff, ) | Civil Action. No.: |
| ) | |
| v. ) | |
| ) | <u>JURY TRIAL DEMANDED</u> |
| EAGLES LANDING FAMILY ) | |
| PRACTICE, LLC and NICHOLAS ) | |
| WILLIAMS ) | |
| ) | |
| Defendants. ) | |
| ) | |

## <u>VERIFIED COMPLAINT FOR DAMAGES</u>

Plaintiff **Mrs. Towanda Smith**, by and through her undersigned attorneys, respectfully submits the following Complaint against Defendants Eagles Landing Family Practice, LLC and Nicholas Williams as follows:

## <u>Preliminary Statement</u>

1.     Following several months of subjection to bizarre acts of sexual misconduct and intimidation by Defendant Nicholas Williams ("Williams"), the Chief Executive Officer of Defendant Eagles Landing Family Practice, LLC ("ELFP"), and consequently suffering extreme emotional trauma resulting in shingles as a physical manifestation, Plaintiff Mrs. Towanda Smith ("Mrs. Smith")

made the only reasonable decision to quit her position as Chief Financial Officer due to an unendurable hostile work environment at ELFP.

2.      Mrs. Smith, a woman, was discriminated against, subjected to extreme and outrageous conduct by Williams, and constructively discharged from her employment with ELFP because of her gender and in retaliation against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. as amended.

3.      Plaintiff, Mrs. Smith, brings this action against ELFP and Williams for violations of Title VII of the Civil Rights Act of 1964 pursuant to 42 U.S.C. §§ 2000e et seq ("Title VII"), and intentional infliction of emotional distress as detailed below.

4.      Mrs. Smith filed a timely charge of discrimination against ELFP with the U.S. Equal Employment Opportunity Commission ("EEOC"), on April 27, 2020, Charge No. 410-2020-05301, concerning the conduct at issue in this Complaint.

5.      On January 21, 2021, the U.S. Equal Employment Opportunity Commission ("EEOC") issued Mrs. Smith a Notice of Right to Sue.  A copy of the Notice of Right to Sue is attached hereto as Exhibit A.

2

## Parties, Jurisdiction and Venue

6.      ELFP is a limited liability company organized under the laws of Georgia with its corporate headquarters located at 2330 Patrick Henry Parkway, Suite 200, McDonough GA 30253.  ELFP is subject to the jurisdiction of this Court and can be served with process by serving its registered agent, C T Corporation System, 289 S Culver St., Lawrenceville, Georgia 30046-4805.

7.      ELFP is a medical practice management company with approximately 426 employees and twelve office locations.

8.      Williams is an individual employed, at all times relevant hereto, as the Chief Executive Officer of ELFP.  Williams resides in this judicial district and may be found at the ELFP corporate headquarters located at 2330 Patrick Henry Parkway, Suite 200, McDonough GA 30253, or at his residence located at 1150 West Garmon Road, Atlanta, GA 30327.

9.      Subject-matter jurisdiction of this Complaint is proper pursuant to 28 U.S.C. § 1331, as this is a civil action arising under Title VII.

10.     This Court has supplemental jurisdiction over Plaintiff's related claims arising under state law pursuant to 28 U.S.C. § 1367.

11.     Venue is proper in this Court under 28 U.S.C. § 1391.

**<u>Factual Allegations</u>**

12.     From 2016 to January 24, 2020, Mrs. Smith worked as the Controller and Chief Financial Officer for ELFP, primarily at the corporate office building located at 2330 Patrick Henry Parkway in McDonough, Georgia.

13.     Beginning even prior to Mrs. Smith's employment with ELFP began, Williams had a history of often engaging in very volatile conduct, marked by yelling, screaming, disruptive outburst, obscene language, and sometimes throwing objects, which created an environment that often lacked civility and professionalism at ELFP.

14.     Mrs. Smith first witnessed this conduct by Williams one day in 2017, when she suddenly heard Williams yelling and throwing things in his office.  When Mrs. Smith asked Williams' assistant if something was wrong, his assistant assured Mrs. Smith that everything was okay and added that Williams' tantrum at that moment was actually toned-down compared to his prior behavior at the ELFP former corporate office location—which the more senior ELFP employees referred to as "the House."

15.     Following other outbursts by Williams in the office, Mrs. Smith checked in with the employees who reported to her, who also said that Williams' outbursts were much worse when their corporate office was at "the House."

16.     Thus, Williams' incivility at ELFP was well known, and had even resulted in at least one former employee, Deena Gore, leaving ELFP because of a hostile working environment.

17.     In or around October of 2019, Mrs. Smith witnessed Williams engage in such conduct even in the presence of ELFP's management team.   That day, Williams requested that Mrs. Smith come to his office and when she arrived, Williams was speaking to three of the Directors at ELFP, each part of the management team, who were seated in the conference room adjacent to Williams' office.   Williams suddenly began yelling, "she's a whore, a f***ing whore! Fire her ass! I don't give a f***! Who does she think she is!"

18.     This rant by Williams continued for at least 2 minutes in the ELFP corporate office building, yet no one corrected or advised Williams to calm down.

19.     Williams also frequently made lewd comments about ELFP employees, including but not limited to physicians and the Chief Operating Officer whom Williams degraded in the office, without any repercussion.

20.    Concerning the Chief Operating Officer, Williams frequently called him a "mother f***er", and said, "Jeff is a little d**k, mother f***er," and often referred to the Chief Operating Officer as "Mangina," a portmanteau word combining the words "man" and "vagina".

21.    While such outlandish conduct by Williams may or may not have amounted to unlawful harassment of others at ELFP, such incivility is often an antecedent to illegal discriminatory workplace harassment, given that it creates a climate of "general derision and disrespect" in which harassing behaviors are tolerated. *Report of the Co-Chairs of the EEOC Select Task Force on the Study of Harassment in the Workplace*, p. 55 (June 20, 2016).

22.    As Williams' conduct went unchecked by ELFP, it became more sexually charged and became directed at Mrs. Smith, where Williams would frequently talk about sexual acts or subjects involving sexual innuendos.

23.    Williams began making sexual commentary more frequently beginning in early 2019, when he told Mrs. Smith that an ELFP employee named Cathy Collins, accused him of asking Ms. Collins to have "a threesome," meaning sexual intercourse with Williams and another individual.

24.    Then over the course of a year and at least twice per month, Williams told Mrs. Smith stories about sexually explicit acts concerning Williams and concerning others, and intentionally subjected Mrs. Smith to pornographic videos and images.

25.    Williams made ELFP a sexually charged workplace for Mrs. Smith, where he would regularly discuss sex at work and display nude photos and videos of women and other sexually explicit content.

26.    These incidents typically happened when Williams required Mrs. Smith to stay at the office late, after the close of business, and mostly alone with him for no legitimate reason.

27.    Williams frequently, arbitrarily, and abruptly required Mrs. Smith to stay at the office late into the evening after everyone else had left and without reasonable advanced noticed, where he would then engage in the sexual misconduct complained of herein.

28.    Just as it was time for everyone to leave the offices at or about 5:00 p.m., Williams suddenly fabricated reasons for Mrs. Smith to stay late in each instance.

29.    While Williams' Assistant was the only other person also still in the ELFP corporate office suite after business hours during a few of the instances, she was never in Williams' office with Williams and Mrs. Smith when Williams engaged in the sexual misconduct complained of herein.

30.    While they were at the office after regular business hours, without warning, Williams repeatedly showed his mobile phone to Mrs. Smith, displaying videos or still images of sexually explicit material.

31.    The sexually explicit images and videos displayed by Williams included, among other subjects:

- naked women;

- women engaging in oral sex;

- a baby with an adult-sized penis;

- a woman smacking another woman on her naked buttocks;

- a man's penis wedged into a cake;

- a man's erect penis over a toilet, upon information and belief, believed to be that of Williams; and

- a video of a woman apparently in a church setting confessing in great detail, sexual acts the woman had done with various men.

8

32.    Without welcome or any suggestion that Mrs. Smith was comfortable with such discussions, Williams told her stories about his sexual behavior, shared details about the size of his penis, and told stories of sexual conduct of others affiliated with ELFP.

33.    Among other unsolicited stories about his sexual behavior, Williams told Mrs. Smith that he had previously been charged with raping a woman and Williams' father was able to get the charges dropped; that Williams previously had a three-way sexual encounter with a woman who was engaged to be married and her fiancé found out about the sexual encounter with Williams, the fiancé and a third person; and that Williams has a large penis with vitiligo.

34.    Mrs. Smith consistently communicated to Williams her discomfort and displeasure about his sexually explicit stories and about the sexually explicit images and videos that Williams showed her, giving Williams notice that even if his conduct was intended as a joke, it was harmful and very disturbing to Mrs. Smith.

35.    Mrs. Smith frequently physically recoiled at Williams' sexual harassment, placing her head in her hands.

36.    Mrs. Smith communicated her disapproval and rejections to each of Williams' acts of sexual harassment by simply walking away, covering her ears,

quickly looking away, and/or saying, for example, "oh my gosh, I don't want to hear that!"

37.     In May 2019, Mrs. Smith even informed Williams that she needed a change in environment.

38.     Nevertheless, on several consecutive days between December 16, and December 30, 2019, Williams intentionally exposed Mrs. Smith to sexually explicit videos and images that he displayed to her on his mobile phone.

39.     On December 30, 2019, after requiring Mrs. Smith to stay at the office late alone with him and while they were discussing a business matter, Williams suddenly looked down at his phone as if he was sending a text message and then said to Mrs. Smith, "Look at what someone sent me." Williams then showed Mrs. Smith the video of a woman standing in front of a church with what appeared to be a pastor.

40.     In the video Williams showed Mrs. Smith on the evening of December 30, 2019, the man who appeared to be a pastor handed the woman the microphone and the woman began confessing about her past life. The woman in the video said, among other things, that she "used to suck men's dicks and balls."

41.     Mrs. Smith was shocked, became very angry, and in response to the video of the woman in church, rebuked Williams saying, "I don't know what's

worse, the person who recorded this or the person who is showing it!" After Mrs. Smith rebuked him, Williams put his phone away and began discussing the business matter again. A few minutes later, Mrs. Smith returned to her desk to complete some work.

42.     Moments later that evening, Williams stepped out of the office and walked outside. While he was outside for a short period of time, at 6:46 p.m., Williams sent Mrs. Smith images, via text-message, of handguns and ammunition. Shortly after sending the images of the handguns and ammunition, Williams came back inside the office and said nothing to Mrs. Smith.

43.     Mrs. Smith understood the images of the handguns and ammunition to be a veiled threat by Williams in response to her rebuffing of his sexual misconduct, and Mrs. Smith became highly disturbed and shaken by the fact that Williams had sent the images.

44.     Since August 2019, Mrs. Smith's physical, mental and emotional health deteriorated significantly because of Williams' sexually charged misconduct, and her health deteriorated rapidly beginning December of 2019.

45.     Williams' conduct was so severe and pervasive that it negatively affected and interfered with Mrs. Smith's ability to do her job.

11

46.     On or about January 2, 2020, Mrs. Smith informed ELFP's Human Resources Director ("H.R. Director") of Williams' misconduct.

47.     That same day, on or about January 2, 2020, Mrs. Smith moved office locations from the corporate office building where Williams' office is located to the same ELFP building where the H.R. Director's office is located at 649 Jonesboro Road, McDonough, Georgia, approximately four miles away from the corporate office building.

48.     The H.R. Director, in response to Mrs. Smith's complaint about Williams' sexually charged misconduct, informed Mrs. Smith there was nothing the H.R. Director could do because it involved Williams and the H.R. Director feared that she, the H.R. Director, would lose her job if she got involved with the matter.

49.     After experiencing severe physical pain for three days, on January 9, 2020, Mrs. Smith was diagnosed with shingles as a result of anxiety and emotional distress that was precipitated by her exposure to Williams' misconduct of sexual harassment and intimidation.

50.     Because her working conditions had become so hostile, intimidating and oppressive, on January 10, 2020, Mrs. Smith presented a letter of resignation to

ELFP's officers and administrative team, informing them that she would only work through February 2020.

51.     However, on January 24, 2020, during a meeting with Williams and the Chief Operating Officer of ELFP, Mrs. Smith confronted Williams about the sexually charged, intimidating and oppressive environment he had created.

52.     Williams did not deny anything but explained to Mrs. Smith and the Chief Operating Officer that his actions were simply done as a joke.

53.     Finding the conditions at ELFP too intolerable and experiencing extreme emotional, mental, and physical distress, Mrs. Smith made her resignation effective immediately that day and did not return to work at ELFP after January 24, 2020.

54.     Williams undertook all the above-pled unlawful conduct intentionally, willfully, and maliciously with respect to Mrs. Smith and her individual rights.

55.     Additionally, and in the alternative, Williams understook all of he above-pled conduct with reckless disregard for Mrs. Smith and her individual rights.

**Count One (against ELFP) – Sexual Harassment in Violation of Title VII**

56.     Mrs. Smith incorporates each of the above factual allegations as if fully stated herein.

57.    Defendant ELFP violated Mrs. Smith's rights under Title VII of the Civil Rights Act of 1964, as amended, by among other things, subjecting her to a sexually harassing and hostile working environment ELFP, through its agent, Williams, engaged in a pattern and practice of unlawful sex discrimination by subjecting Mrs. Smith to unwelcome sexual harassment. The above-described unwelcome sexual harassment created an intimidating, oppressive, hostile and offensive work environment which interfered with Mrs. Smith's emotional well-being.

58.    ELFP, at all times relevant hereto had actual and constructive knowledge of the conduct described herein.

59.    As a result of the hostile and offensive work environment perpetrated and maintained by ELFP, and ELFP's failure to protect Mrs. Smith from further harassment, Mrs. Smith suffered severe emotional distress, including but not limited to sleeplessness, severe physical pain, shingles, and anxiety that is still ongoing.

60.    ELFP failed to adequately discipline, and/or otherwise penalize the conduct, acts of Williams as described herein.

61.     ELFP failed to comply with its statutory duty to take all reasonable and necessary steps to eliminate sexual harassment from the workplace and to prevent it from occurring in the future.

62.     As a direct and proximate result of Defendants' willful, knowing and intentional discrimination against her, Mrs. Smith has suffered and will continue to suffer pain and suffering, and extreme and severe mental anguish and emotional distress; she has incurred and will continue to incur medical expenses for treatment by psychotherapists and other health professionals, and for other incidental expenses; and she has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. Mrs. Smith is thereby entitled to general and compensatory damages in amounts to be proven at trial.

63.     As a further direct and proximate result of Defendants' sexual harassment, as heretofore described, Mrs. Smith has been compelled to retain the services of counsel, and has thereby incurred, and will continue to incur, legal fees and costs, the full nature and extent of which are presently unknown to Mrs. Smith, who therefore will seek leave of Court to amend this Complaint in that regard when the same shall be fully and finally ascertained. Mrs. Smith requests that attorneys' fees be awarded as allowed by law.

64.     The outrageous conduct of Defendants described above was done with oppression and malice; with a conscious disregard for Mrs. Smith's rights; and with the intent, design and purpose of injuring Mrs. Smith. ELFP, through its officers and managing agents, committed and authorized, condoned and/or ratified the unlawful conduct of Williams. By reason thereof, Mrs. Smith is entitled to punitive or exemplary damages from ELFP in a sum according to proof at trial.

**Count Two (against ELFP) – Retaliation in Violation of Title VII**

65.     Mrs. Smith incorporates each of the above factual allegations as if fully stated herein.

66.     Title VII prohibits employers from retaliating against employees who report or oppose sexual harassment.

67.     Defendants' conduct as alleged herein amounts to retaliation by ELFP against Mrs. Smith for opposing Williams' harassing conduct.

68.     As herein alleged, ELFP illegally retaliated against Mrs. Smith when Williams texted an image of a handgun and several rounds of ammunition to Mrs. Smith in an effort to intimidate her for opposing Williams' sexual harassment and subjected Mrs. Smith to intimidation through a knowing and willful course of

conduct which caused severe emotional distress by placing Mrs. Smith in reasonable fear for her safety, solely because she rebuffed Williams' sexual harassment.

69.    As herein alleged, EFLP illegally retaliated against Mrs. Smith by subjecting her to conduct that amounted to criminal stalking by Williams at Mrs. Smith's place of employment, pursuant to Georgia Code Section 16-5-90, by contacting her through an electronic device for the purpose of harassing and intimidating Mrs. Smith, solely because she rebuffed Williams' sexual harassment.

70.    Defendants had no legitimate business reasons for any of such acts. Each of said acts of retaliation are in violation of federal law.

71.    As a direct and proximate result of Defendants' willful, knowing and intentional discrimination and retaliation against her, Mrs. Smith has suffered and will continue to suffer pain and suffering, and extreme and severe mental anguish and emotional distress.  Mrs. Smith has suffered and will continue to suffer a loss of earnings and other employment benefits and job opportunities. Mrs. Smith is thereby entitled to general and compensatory damages in amounts to be proven at trial.

72.    As a further, direct and proximate result of ELFP's retaliation in violation of federal and state law, as heretofore described, Plaintiff has been compelled to retain the services of counsel, and has thereby incurred, and will

continue to incur, legal fees and costs, the full nature and extent of which are presently unknown to her.

73.    The outrageous conduct of Defendants as described above was done with malice and oppression, with conscious disregard for Mrs. Smith's rights, and with the intent, design and purpose of injuring her. ELFP, through its officers and managing agents, authorized, condoned and/or ratified the unlawful conduct of Williams. By reason thereof, Mrs. Smith is entitled to punitive or exemplary damages from ELFP in a sum according to proof at trial.

### Count Three (against ELFP) – Constructive Discharge

74.    Mrs. Smith incorporates each of the above factual allegations as if fully stated herein.

75.    Defendants' conduct as alleged herein amounts to a constructive discharge of Mrs. Smith. Because of the hostile work environment, retaliation, criminal stalking and other unlawful conduct as alleged herein, Mrs. Smith suffered from such severe working conditions that she was discriminated against by her employer to the point where a reasonable person in her position would have felt compelled to resign, and Mrs. Smith was accordingly forced to resign from her job.

76.    ELFP is thus liable to Mrs. Smith for her constructive discharge.

## Count Three (against Williams) – Intentional Infliction of Emotional Distress

77.     Mrs. Smith incorporates each of the above factual allegations as if fully stated herein.

78.     Williams' conduct toward Mrs. Smith, the above-described unwelcome sexual harassment and retaliatory threat in response to Mrs. Smith's objection to the same, was willful, wanton, and intentional, and such conduct would naturally humiliate, embarrass, and outrage Mrs. Smith.

79.     Despite having notice of Williams' conduct, through Mrs. Smith's complaint to the H.R. Director, ELFP failed to adequately discipline Williams and, as a result, ratified his conduct.

80.     As a result of Williams' misconduct, Mrs. Smith suffered severe emotional distress with shingles as a physical manifestation of the same.

81.     Williams is liable to Mrs. Smith for intentional infliction of emotional distress.

## Count Four (against Williams) – Punitive Damages

82.     Mrs. Smith incorporates each of the above factual allegations as if fully stated herein.

83.     The aforementioned actions of Williams exhibited willful misconduct, malice, wantonness, oppression, and the entire want of care which would raise the presumption of conscious indifference to consequences.

84.     Accordingly, Williams' actions warrant damages sufficient to deter, penalize or punish Williams considering the circumstances of the case.

**WHEREFORE**, Plaintiff prays:

I.      that a summons be issued and served requiring the Defendants to appear as provided by law to answer this Complaint;

II.     a declaratory judgment that Defendant ELFP violated Mrs. Smith's rights under Title VII;

III.    an injunction prohibiting the Defendants from engaging in such unlawful conduct in the future;

IV.     full back pay from the date of Mrs. Smith's constructive termination, taking into account all raises to which Mrs. Smith would have been entitled and all fringe benefits of employment, with prejudgment interest thereon;

V.      front pay to compensate Mrs. Smith for her lost future wages and benefits;

VI.     compensatory damages against Defendant ELFP in an amount to be determined by the enlightened conscience of the jury, up to the maximum statutory amount allowed under Title VII, for Mrs. Smith's emotional distress, suffering, inconvenience, mental anguish, loss of enjoyment of life and special damages;

VII.    compensatory damages against Defendant Williams in an amount to be determined by the enlightened conscience of the jury, for Mrs. Smith's emotional distress, suffering, inconvenience, mental anguish, loss of enjoyment of life and special damages;

VIII.   punitive damages against Defendant ELFP in an amount to be determined by the enlightened conscience of the jury to be sufficient to punish Defendant ELFP, up to the maximum statutory amount allowed under Title VII, for ELFP's conduct toward Mrs. Smith;

IX.     punitive damages against Defendant Williams in an amount to be determined by the enlightened conscience of the jury to be enough to punish Defendant Williams for his conduct toward Mrs. Smith and deter him from similar conduct in the future;

X.      reasonable attorneys' fees and costs pursuant to 42 U.S.C.A. § 2000e-5(k) and Title VII;

21

XI.    for such other and further relief as may be just and equitable.

This 9th day of April, 2021.

> **WARGO & FRENCH LLP**
>
> */s/ Vernon M. Strickland*
> Vernon M. Strickland
> Georgia Bar No. 345346
> Patrick Fitzgerald
> Georgia Bar No. 405638
> 999 Peachtree Street, NE
> 26th Floor
> Atlanta, Georgia 30309
> Telephone: 404-853-1500
> Facsimile:  404-853-153
> vstrickland@wargofrench.com
> pfitzgerald@wargofrench.com
>
> *Attorneys for Plaintiff Towanda Smith*

## DECLARATION

I declare under penalty of perjury that I have read the foregoing VERIFIED
COMPLAINT FOR DAMAGES and that the contents stated therein are true to the best of my
knowledge, information and belief.

Towanda Smith
1012 Laurel Ridge Drive
McDonough, GA 30252

4/9/2021
Date