FILED IN CHAMBERS
U.S.D.C ATLANTA

Date: Jul 14 2022

KEVIN P. WEIMER , Clerk

By: s/Kari Butler
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

TOWANDA SMITH,

     Plaintiff,

  v.

EAGLES LANDING FAMILY
PRACTICE, LLC, and
NICHOLAS WILLIAMS,

     Defendants.

CIVIL ACTION FILE

NO. 1:21-CV-1426-LMM-WEJ

## **FINAL REPORT AND RECOMMENDATION**

Plaintiff, Towanda Smith, claims that her former employer, Eagles Landing Family Practice, LLC ("Eagles Landing"), subjected her to a sexually hostile work environment and retaliated against her in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., leading to her constructive discharge.  (Compl. [1] Counts I-III.)  She also alleges state law claims against Eagles Landing's CEO, Nicholas Williams, for intentional infliction of emotional

distress ("IIED") and punitive damages.  (Id. Counts IV-V.)[1]  Eagles Landing filed a counterclaim against Ms. Smith, alleging that she breached the Protective Covenant Agreement ("PCA") [86-3] (i.e., her employment contract) by operating a tax preparation and CPA business independent of her position as its Controller. (Defs.' Answer & Countercl. [10].)

After a period of discovery, Eagles Landing and Mr. Williams filed Defendants' Motion for Summary Judgment [80].  Ms. Smith also filed a Motion for Summary Judgment [86].  The parties have fully briefed those Motions and they are ripe for resolution.  Accordingly, for the reasons stated below, the undersigned **RECOMMENDS** that defendants' joint Motion be **DENIED** as to all of Ms. Smith's claims.  Furthermore, the undersigned **RECOMMENDS** that Ms. Smith's Motion be **GRANTED** as to Eagles Landing's counterclaim.

## I.   STATEMENT OF FACTS

To assist with framing the undisputed material facts, Local Civil Rule 56.1 requires certain filings by the parties in conjunction with a summary judgment motion.  Defendants as movants on their Motion for Summary Judgment filed a

---

[1] The Complaint misnumbers the counts against Mr. Williams as Counts III and IV.  To avoid confusion the Court has adjusted the numbering of those claims to clarify that obvious typographical error.  (See Compl. ¶¶ 77-84.)

Statement of Material Facts [80-2] ("DSMF"), to which plaintiff responded.  (See Pl.'s Resp. to DSMF [98] ("R-DSMF").)  As allowed by the Local Civil Rules, plaintiff as respondent filed a Statement of Additional Material Facts [99] ("PSAF"), to which defendants responded.  (See Defs.' Resp. to PSAF [107] ("R-PSAF").)  PSAF proposes facts which include many of the same facts proffered by defendants in support of their Motion and elaborated upon in plaintiff's response thereto.  (Compare DSMF, and R-DSMF, with PSAF.)  Thus, where a proposed fact set forth in PSAF is sufficiently addressed in Part I via DSMF and R-DSMF, the Court appends the citation "see also PSAF" with the relevant paragraph citation.

Plaintiff, as movant on her Motion seeking summary judgment against Eagles Landing on its counterclaim for breach of the PCA, filed a Statement of Undisputed Facts [86-2] ("PSMF"), to which Eagles Landing responded.  (See Def. Eagles Landing's Resp. to PSMF [96] ("R-PSMF").)  Included within that response is Eagles Landing's Statement of Additional Material Facts [96, at 23-29] ("DSAF"), to which plaintiff responded.  (See Pl.'s Resp. to DSAF [109] ("R-DSAF").)  Where PSMF and DSAF are sufficiently addressed in Part I via facts already proposed with regard to defendants' Motion, the Court simply appends the citation "see also PSMF" or "see also DSAF" with the relevant paragraph citation.

The Court uses the parties' proposed facts and responses as the basis for the Statement of Facts under the following conventions.   When a party admits a proposed fact (in whole or in part), the Court accepts that fact (or the part admitted) as undisputed for the purposes of this Report and Recommendation and cites only to the proposed fact.   When a party denies a proposed fact (in whole or in part), the Court reviews the record cited and determines whether that denial is supported, and if it is, whether any fact dispute is material.   To reflect the record more accurately, the Court sometimes modifies a proposed fact per the record cited by the party or in the opposing party's response.[2]   The Court also includes facts drawn from its review of the record, <u>see</u> Fed. R. Civ. P. 56(c)(3), excludes immaterial proposed facts,[3] and rules on objections to proposed facts.   <u>See</u> N.D. Ga. Civ. R. 56.1(B)(1)(c).

Additionally, because Ms. Smith's claims involve distinctly different issues from those set forth in Eagles Landing's counterclaim, the Court does not attempt to state the facts of this case chronologically.   Rather, after providing mostly

---

[2] Many paragraphs of DSMF had to be modified because defendants often omitted details necessary to determine whether Ms. Smith was subjected to a sexually hostile work environment.

[3] The Court excludes as immaterial DSMF ¶¶ 11-12, 17, 43, 47; PSAF ¶¶ 2-4, 10, 30-34; PSMF ¶¶ 6-7, 10, 12-20, 23-26, 29-30, 33-50; and DSAF ¶¶ 7-8.

4

background information in Parts I.A-B, the Court states facts relevant to Ms. Smith's claims in Parts I.C-E, and states facts relevant to Eagles Landing's counterclaim in Parts I.F-H.  Where the parties dispute facts relevant to both Motions, the Court states both Ms. Smith's and defendants' versions of the events. Finally, the Court views all proposed facts in light of the standards for summary judgment set out infra Part II with regard to each party's Motion.

## A.    The Parties

Mr. Williams along with his wife, Collyn Steele, M.D., own Eagles Landing. (PSAF ¶ 1.)  Mr. Williams began employment with Eagles Landing in January 2012 and has served as its CEO since 2018.  (DSMF ¶ 2; see also PSAF ¶ 1; PSMF ¶ 3.)[4]

Eagles Landing hired Ms. Smith (a CPA) on June 6, 2016 as a financial analyst.  (DSMF ¶ 1, as modified by R-DSMF ¶ 1; see also PSMF ¶ 1.)  Ms. Smith became Controller for Eagles Landing sometime in 2017 and remained in that role until she resigned on January 24, 2020.[5]  (DSMF ¶ 1, as modified by R-DSMF ¶ 1;

---

[4] The Court overrules plaintiff's objection to DSMF ¶ 2 because that proposed fact is supported by the record citation and plaintiff's proposed additional information regarding Mr. Williams's titles is immaterial.  (See R-DSMF ¶ 2.)

[5] On January 10, 2020, Ms. Smith sent an email [80-4] to Mr. Williams and Dr. Steele (and others at Eagles Landing) that she called her "Resignation Letter" and stated that her last day of work would be February 28, 2020.  (PSMF ¶¶ 1, 4, as modified by R-PSMF ¶¶ 1, 4.)

PSMF ¶ 4, as modified by R-PSMF ¶ 4.)  Ms. Smith reported to Mr. Williams. (DSMF ¶ 3; see also PSMF ¶ 3.)

From 2018 until her resignation, Ms. Smith was the only CPA on Eagles Landing's staff of more than 400 employees and she oversaw the practice's financial affairs.  (PSMF ¶ 2; Pl.'s Reply [108] 1 n.1.)  Ms. Smith generally was responsible for preparing financial statements, overseeing payroll and accounts payable, providing tax advice, and overseeing Eagles Landing's relationship with outside accounting firm Bennett Thrasher LLP, which prepared the practice's corporate tax returns.  (DSMF ¶ 3, as modified by R-DSMF ¶ 3.)

## B.    Mr. Williams's Behavior From 2016 to April 2019

From 2016 to April 2019, Ms. Smith worked in an office next to Mr. Williams at 2330 Patrick Henry Parkway, Suite 200, in McDonough, Georgia (the "Patrick Henry Suite").  (PSAF ¶ 5.)  Mr. Williams frequently raised his voice in his office in reaction to both business and personal matters that were not going as planned and used profanity "all the time."  (DSMF ¶ 14, as modified by R-DSMF ¶ 14; see also PSAF ¶ 7.)  Mr. Williams used terms such as "mother-fucker, fucker, whore, shit [and] damn-it" and "fucking whore" and regularly and repeatedly

referred to COO Jeff Mitcham as "mangina" and "little dick motherfucker."[6] (DSMF ¶¶ 14-15, as modified by R-DSMF ¶¶ 14-15; Smith Dep. [84-1] 84-85, 100; see also PSAF ¶ 6.)  Ms. Smith heard Mr. Williams use the phrase "little dick" in reference to Mr. Mitcham at least every other week.  (Smith Dep. [84-1] 100; PSAF ¶ 16, as modified by R-PSAF ¶ 16.)

According to Ms. Smith, in two April 2019 meetings days apart she told Mr. Williams that his yelling and name calling were disturbing to her and affected her ability to work productively.  (PSAF ¶ 11; Second Smith Decl. [99-1] ¶¶ 3-4.)[7]  At the second meeting, Ms. Smith allegedly told Mr. Williams that his conduct was so disturbing that she was having emotional and health issues and asked him if she could "take FMLA leave"; he responded that she could not because it would make

_____

[6] Ms. Smith generally overheard the comments set forth in the sentence preceding this footnote from her office and those comments were not directed at her.  (DSMF ¶ 16, as modified by R-DSMF ¶ 16.)

[7] The Court overrules defendants' objection to Ms. Smith's assertion in her second declaration that she spoke to Mr. Williams twice in April 2019 because that testimony is not clearly contradicted by her deposition testimony and is supported by the record citations.  (See R-PSAF ¶ 11; Smith Dep. [84-1] 91-92 (testifying that Ms. Smith had a conversation regarding Mr. Williams's outbursts in April 2019 and also specifically spoke to him about those outbursts concerning a property sale, leaving open the possibility that she had two conversations with Mr. Williams about that same behavior).)  Moreover, whether Ms. Smith spoke to Mr. Williams once in April or twice only days apart does not change the outcome of this Report and Recommendation.

her unavailable to him for business matters.  (PSAF ¶ 12.)[8]  Ms. Smith then asked

Mr. Williams if she could work from home instead and he agreed.   (PSAF ¶ 12;

Second Smith Decl. [99-1] ¶¶ 4-5; Smith Dep. [84-1] 2-93.)

Beginning in April 2019, Mr. Williams agreed to Ms. Smith's request for a

flexible work schedule, provided she was able to perform her job duties.  (PSMF ¶

27, as modified by R-PSMF ¶ 27;[9] Williams Decl. [96-2] ¶ 11; see also DSAF ¶

11.)[10]  According to Mr. Williams, Ms. Smith then packed up and removed all of

her personal belongings from her Eagles Landing office and turned in her company-

_____

[8] As explained supra footnote 7, Ms. Smith's deposition testimony and second declaration do not contradict each other regarding her April 2019 interactions with Mr. Williams.  Additionally, the Court overrules defendants' objection to PSAF ¶ 12 because that proposed fact is supported by the record citations.  (See R-PSAF ¶ 12.)  Furthermore, the law is clear that plaintiff cannot amend her claims at this stage of the litigation via her brief, Gilmour v. Gates, McDonald & Co., 382 F.3d 1312, 1315 (11th Cir. 2004) (per curiam) (holding that a plaintiff may not amend her complaint through argument in a brief), and there is no indication that plaintiff is attempting to amend the Complaint to assert a Family Medical Leave Act claim.

[9] The Court sustains defendants' partial objection to PSMF ¶ 27 and excludes Ms. Smith's allegation that Mr. Williams allowed her to work part-time.  (See R-PSMF ¶ 27.)  Because PSMF ¶ 27 is applicable to Ms. Smith's Motion, the Court must accept his version of events.

[10] DSAF ¶ 11 proposes a slightly different version of the fact set forth in the preceding sentence; however, those inconsistences are irrelevant to the outcome of the parties' Motions.

8

issued cell phone.  (DSAF ¶ 12.)[11]  Around May 2019, Ms. Smith adjusted her annual salary from $132,000 to $100,000.  (PSMF ¶ 28, as modified by R-PSMF ¶ 28;[12] Williams Decl. [96-2] ¶ 22 (declaring that he did not recall directing Ms. Smith's salary to be reduced and that "as Controller, Ms. Smith had the ability to make her own pay adjustments").)

According to Ms. Smith, from April 2019 to September 2019, she primarily worked from home but still reported to Eagles Landing's offices three days per week to, among other things, process payroll with the HR team.  (PSAF ¶ 13; <u>see also</u> PSMF ¶ 31.)[13]  According to Mr. Williams, Ms. Smith stopped coming to the office altogether soon after March 2019 and he did not see her at the Patrick Henry

---

[11] The Court overrules plaintiff's materiality objection and includes DSAF ¶ 12 as stated because it is supported by the record citation.  (<u>See</u> R-DSAF ¶ 12.)

[12] The Court sustains defendants' objection to PSMF ¶ 28 and excludes Ms. Smith's allegation that her salary was reduced in exchange for part-time status and a remote work arrangement.  (<u>See</u> R-PSMF ¶ 28.)  Because PSMF ¶ 28 is applicable to Ms. Smith's Motion, the Court must accept Mr. Williams's version of events.

[13] Because the parties dispute the frequency with which Ms. Smith was in the office from March 2019 through her resignation in January 2020, the Court includes both versions of events and must view the facts in the light most favorable to the non-movant when ruling on the pending Motions.

Suite again on a regular basis, although his office was near hers and he was generally in the office in 2019.  (DSAF ¶ 13.)[14]

Although Ms. Smith never received a disciplinary action while she worked for Eagles Landing, sometime in the summer of 2019, Mr. Williams told Ms. Smith that he really needed her in the office more.  (PSMF ¶ 5, as modified by R-PSMF ¶ 5; Williams Dep. [84-2] 111.)  The parties dispute whether Ms. Smith returned to full-time in-person work at Eagles Landing's offices.  According to Ms. Smith, she did so in October 2019.  (PSAF ¶ 15.)  According to Eagles Landing, Ms. Smith was never a part-time employee, but rarely came into the office after she began her flexible work schedule and until her resignation in January 2020.  (Williams Decl. [96-2] ¶¶ 11-14, 23; McDonald Decl. [96-3] ¶¶ 4, 6-9, 11.)[15]

---

[14] The Court overrules plaintiff's objection to DSAF ¶ 13 because that proposed fact is supported by the record citation.  (See R-DSAF ¶ 13.)

[15] The Court sustains defendants' objection to PSMF ¶ 32 and excludes that proposed fact because they have directly rebutted it with citations to contrary testimonial evidence.  (See R-PSMF ¶ 32.) The Court may not make credibility determinations at this stage of the litigation and must view the facts relevant to plaintiff's Motion in the light most favorable to Eagles Landing.

### C.   Mr. Williams's Inappropriate Interactions with Ms. Smith[16]

The Court sets forth Mr. Williams's alleged inappropriate conduct as testified to by Ms. Smith and viewed in a light most favorable to her given its relevance to defendants' Motion for Summary Judgment.  According to Ms. Smith, all but one instance of Mr. Williams's "inappropriate conduct" took place between August 2019 and December 2019.  (DSMF ¶ 35, as modified by R-DSMF ¶ 35.)[17] She recorded some of Mr. Williams's behavior in real-time in a journal that she used to take notes at work.  (DSMF ¶ 38, as modified by R-DSMF ¶ 38; Smith Dep. [84-1] 43-45, 293-94; Smith Journal [80-13]; see also PSAF ¶ 18.)

_____

[16] As of April 2019, the only concerns Ms. Smith had with Mr. Williams related to his loud disruptions, outbursts, frequent use of obscenities, and name calling.  (DSMF ¶ 13, as modified by R-DSMF ¶ 13 and Smith Dep. [84-1] 78 (discussing concerns in April of 2019).)  DSMF ¶ 13 cites page 78 of Ms. Smith's deposition for support and while the proposed fact states that "until August of 2019" plaintiff only expressed the above concerns, she testified that she expressed those concerns as of April 2019.  (Compare DSMF ¶ 13, with Smith Dep. [84-1] 78.) Thus, the Court corrects that typographical error and modifies the proposed fact to accurately summarize the record citation and address plaintiff's partial dispute.

[17] The Court sustains defendants' objection to PSAF ¶ 17 because the proposed fact regarding the "near-daily" frequency of Mr. Williams's alleged conduct is not supported by the record citations.  (See R-PSAF ¶ 17.)  Moreover, plaintiff's testimony as to the frequency of Mr. Williams's specific behavior is reflected infra.

11

Several female employees other than Ms. Smith observed some of Mr. Williams's behavior, such as showing videos and images with nudity, describing sexual acts, and bragging about the size of his penis and his father's penis. (PSAF ¶ 8, as modified by R-PSAF ¶ 8; Williams Dep. [84-2] 200-01; McDonald Dep. [89-4] 51, 56; Grady Dep. [102-1] 19-37, 54-55, 90; Wright Dep. [89-3] 60.) Mr. Williams did not engage in that behavior in front of male employees, such as Mr. Mitcham and Joe Falcomata. (PSAF ¶ 9.)

Ms. Smith generally alleges that these incidents occurred the same way: Ms. Smith would go to Mr. Williams's office to discuss financial business matters; he would indicate that she should shut the door; during their conversation, Mr. Williams would pivot to making an inappropriate statement or showing her an inappropriate image or video; and Ms. Smith would try to think of an exit plan. (DSMF ¶ 36, as modified R-DSMF ¶ 36; Smith Dep. [84-1] 228-30, 232 (Mr. Williams's behavior came "out of the blue"), 233 ("Anytime that Mr. Williams would do something like that, I would always make sure I found or tried to find an exit plan . . . like to leave."), 234 ("I was trying to think of an exit plan once that comment came out . . . once you make a comment like that, you can't quite think about work after that.").)

Additionally, Ms. Smith would react to Mr. Williams's behavior in various ways, such as by putting her head down in her hands, putting her hands over her ears, saying "Lord help me," "Oh, my God," or "I don't need to hear that." (DSMF ¶ 37, as modified by R-DSMF ¶ 37; Smith Dep. [84-1] 245-48, 272, 285; see also PSAF ¶ 19.) According to Ms. Smith, "Mr. Williams definitely heard some of [her] comments because he would see [her] reaction and seemed like he found that humorous." (Smith Dep. [84-1] 286; see also PSAF ¶ 19.)

Although Ms. Smith could have walked out of Mr. Williams's office at any time during the incidents, she did not do so because she "felt like that was rude" and she "wouldn't do that" to her boss. (DSMF ¶ 39.) Likewise, Ms. Smith did not tell Mr. Williams to stop and did not go to Eagles Landing's Human Resources Department ("HR") because Mr. Williams was her boss and the CEO. (Smith Dep. [84-1] 199-200, 245, 251-52 ("Well, he's his boss. He's the top. I don't - - I didn't know what to do.").) Ms. Smith testified that her "own fears" stopped her from going to HR. (Id. at 252.)

The first instance of such behavior by Mr. Williams occurred sometime before August 2019. (Smith Dep. [84-1] 193-96; see also PSAF ¶ 14.) Mr. Williams stated to Ms. Smith that he took a DNA test and was 2 percent black and the black was concentrated and he did a dance by "gyrat[ing] his hips around and

13

rub[bing] his hands in front of his penis."  (Smith Dep. [84-1] 195-99; see also DSMF ¶ 19, as modified by R-DSMF ¶ 19; see also PSAF ¶ 14.)  Mr. Williams sporadically repeated that same statement and accompanying dance thereafter in front of Ms. Smith while she worked for Eagles Landing.  (Smith Dep. [84-1] 281, 287-88, 290-92; see also PSAF ¶ 14.)[18]  Ms. Smith did not report Mr. Williams's behavior to HR because he was the CEO.  (DSMF ¶ 20, as modified by R-DSMF ¶ 20; Smith Dep. [84-1] 199-200.)  Likewise, she did not explicitly tell Mr. Williams that his statement and dance made her uncomfortable and embarrassed, but said "Oh, my God," dropped her head, placed her face in her hands, and left his office after he finished.  (Smith Dep. [84-1] 198-201.)

Sometime between August and December 2019, Mr. Williams told Ms. Smith that his father-in-law had sex with a doctor who worked for Eagles Landing.  (DSMF ¶ 26, as modified by R-DSMF ¶ 26; Smith Dep. [84-1] 227-32.)  During that period, Mr. Williams also told Ms. Smith that he had "a threesome" with an

---

[18] The Court sustains plaintiff's partial objection to DSMF ¶ 20's proposal that Mr. Williams's performance occurred once because she has directly refuted that portion of the proposed fact with citations to her deposition.  (See R-DSMF ¶ 20.)  Thus, the Court modifies the proposed fact to accurately represent Ms. Smith's deposition testimony.  (See Smith Dep. [84-1] 292 (testifying that Mr. Williams's 2 percent black statement and accompanying dance was a "repetitive thing[]").)

14

engaged woman and when her fiancé found out he called off the engagement. (DSMF ¶ 33, as modified by R-DSMF ¶ 33; Smith Dep. [84-1] 270-71.) Additionally, Mr. Williams stated to Ms. Smith that he had been "accused of rape and his dad got him off." (Smith Dep. [84-1] 273, 276.) Also during that time frame, Mr. Williams showed Ms. Smith multiple images of naked women with various "pronounced" or bigger body parts, including "bigger butt, breasts, big thighs, some overweight." (DSMF ¶ 34, as modified by R-DSMF ¶ 34; Smith Dep. [84-1] 340-41, 349-50.)

On August 8, 2019, Mr. Williams and Ms. Smith were in his office after hours with the door closed when he discussed an incident when he was in college and he and his friends witnessed their friend having a sexual encounter with a woman. (Smith Dep. [84-1] 238-44; DSMF ¶ 21; Smith Journal [80-13] 5.) Ms. Smith testified that Mr. Williams mimicked the woman's moaning sounds and told her that the woman was "bent over doggie style" and that his friend was having sex with the woman from the back. (Smith Dep. [84-1] 244, 293-94 (testifying to taking notes while Mr. Williams was speaking).)

On August 21, 2019, while Ms. Smith was in Mr. Williams's office with the door closed after hours, he told her that his wife looked like "an epileptic at a strobe

15

light concert every time she has an orgasm." (DSMF ¶ 22; Smith Journal [80-13] 12; Smith Dep. [84-1] 222-23, 225, 289-90.)

On September 19, 2019, Mr. Williams made a comment about a friend who had his "penis sucked by [a] man." (DSMF ¶ 23; Smith Journal [80-13] 6.)

On October 2, 2019, Mr. Williams mentioned to Ms. Smith that his father had a large penis. (DSMF ¶ 24; Smith Journal [80-13] 3; Smith Dep. [84-1] 238.)

Sometime between October and November 2019, Mr. Williams and Ms. Smith were standing in the hall during normal workday hours when they saw a pregnant employee walk down the hall. (Smith Dep. [84-1] 218-20.) Mr. Williams commented to Ms. Smith that the woman's legs were "fat and disgusting." (Id.) Ms. Smith stated that the woman was 9 months pregnant and Mr. Williams responded that "he didn't know." (Id.)

On November 1, 2019, Mr. Williams showed Ms. Smith an image of a baby with a grown man's penis and asked if she wanted to see his baby picture. (DSMF ¶ 25; Smith Journal [80-13] 8.) Mr. Williams showed Ms. Smith that particular "baby picture" image more than once. (R-DSMF ¶ 25; Smith Dep. [84-1] 348.)

On November 4, 2019, Mr. Williams told Ms. Smith of a conversation between himself and a male friend regarding sex after marriage where they were teasing their wives (one of whom made a comment that sex after marriage was

16

quicker) and the men shared the comment that "all dicks feel bigger in the ass." (Smith Dep. [84-1] 238, 277-83; DSMF ¶ 27.)

On December 6, 2019, Ms. Smith recorded in her journal that Mr. Williams stated that "white men pass on fucking" overweight women.  (Smith Journal [80-13] 10.)

On December 16, 2019, Mr. Williams showed Ms. Smith a 20 to 30-second long video of two partially clothed women giggling with one woman smacking the other woman on her large naked buttocks, which shook.  (DSMF ¶ 28, as modified by R-DSMF ¶ 28; Smith Dep. [84-1] 350-51.)

On December 17, 2019, Mr. Williams told Ms. Smith that he had been diagnosed with vitiligo on his penis and said that he had a "dick on his dick," meaning that the skin condition was "forming in the shape of a penis on his penis." (DSMF ¶ 29, as modified by R-DSMF ¶ 29; Smith Dep. [84-1] 296-99; Smith Journal [80-13] 14.)

On December 19, 2019, Mr. Williams showed Ms. Smith an image of a man standing over a toilet with an erect penis.  (DSMF ¶ 30, as modified by R-DSMF ¶ 30; Smith Dep. [84-1] 327, 354-55.)  Ms. Smith believed the image was of Mr. Williams and was taken with a cellphone camera because a hand and the tip of a phone were reflected in the toilet water.  (Smith Dep. [84-1] 327, 354-55.)

On December 20, 2019, Mr. Williams showed Ms. Smith an image of a white man's penis wedged into a cake.  (DSMF ¶ 31; Smith Dep. [84-1] 352-54.)  Ms. Smith again believed the image was of Mr. Williams because of the splotchy coloration of the penis and his recent statement that he had vitiligo on his penis. (Smith Dep. [84-1] 353-54.)

On December 23, 2019, Mr. Williams showed Ms. Smith a video of two women engaged in oral sex.  (DSMF ¶ 32; Smith Dep. [84-1] 341-43.)  Ms. Smith said something along the lines of, "Oh, my God, that's disgusting," tried to close her eyes, not see, and walk away.  (Smith Dep. [84-1] 343-45.)

On December 30, 2019, Mr. Williams showed Ms. Smith a video of a black woman at a church service standing at the front of the church with the pastor and confessing that in her past she "suck[ed] dicks and balls."  (DSMF ¶ 40; Smith Dep. [84-1] 306-08; see also PSAF ¶ 20.)  Ms. Smith told Mr. Williams, "I don't know what's worse, the person who recorded it or the person who's showing it," and Mr. Williams looked confused and put his phone down.  (DSMF ¶ 41; Smith Dep. [84-1] 315; see also PSAF ¶ 20.)  After making that comment, Ms. Smith left Mr. Williams's office but continued to work in Eagles Landing's offices for 40 to 60 minutes.  (DSMF ¶ 42; Smith Dep. [84-1] 315-16.)

At 6:46 p.m. that day, Mr. Williams sent Ms. Smith images of two handguns and ammunition via text message with the names of the guns underneath the images. (DSMF ¶ 44, as modified by R-DSMF ¶ 44; Smith Dep. [84-1] 318-21 & Ex. 19 [80-8]; see also PSAF ¶ 21.)  Ms. Smith did not ask Mr. Williams about the text message or why he sent it.  (DSMF ¶ 45, as modified by R-DSMF ¶ 45; Smith Dep. [84-1] 322-23, 333.)  Ms. Smith interpreted the text message with the handguns and their names as a threat from Mr. Williams after she rebuked him for subjecting her to the above video.  (DSMF ¶ 46, as modified by R-DSMF ¶ 46; Pl.'s Resp. to Defs.' Interrog. No. 19 [80-15]; Smith Dep. [84-1] 333-34; see also PSAF ¶ 21.)

Despite the above alleged behavior, Mr. Williams never touched Ms. Smith inappropriately, never asked or explicitly suggested that they engage in any form of romantic or sexual relationship, never verbally threatened her, and never called her a derogatory name.  (DSMF ¶ 18, as modified by R-DSMF ¶ 18; Smith Dep. [84-1] 181-82 (testifying that Mr. Williams may have been implicitly suggesting a sexual relationship given the content of the images and videos he shared with her).)

On December 31, 2019, Ms. Smith texted Mr. Williams about a work issue and, on January 1, 2020, she individually sent every member of Eagles Landing's administrative team (including Mr. Williams and Dr. Steele) a "Happy New Year"

text message.  (DSMF ¶ 45, as modified by R-DSMF ¶ 45; Smith Dep. [84-1] 331-33 & Exs. 20 [80-9] & 21 [80-10].)

### D.  Ms. Smith's Report to Human Resources and Resignation

In late-December 2019, Ms. Smith decided that she needed to go to HR about Mr. Williams's behavior because "everything shifted" when "he distinctly just talked about his genitals" and showed her pictures that she believed to be of his penis.  (Smith Dep. [84-1] 252, 327, 353-55, 357-58; PSAF ¶ 22, as modified by R-PSAF ¶ 22.)  Ms. Smith did not go to HR sooner because she "was scared," she "didn't know what to say," and she "was embarrassed."  (Smith Dep. [84-1] 257.)

On January 2, 2020, Ms. Smith moved her office from the Patrick Henry Suite to the HR office at Eagles Landing's Jonesboro Road location.  (PSAF ¶ 23.) That same day Ms. Smith reported her concerns of inappropriate behavior by Mr. Williams to Eagles Landing HR.  (DSMF ¶ 48; Smith Dep. [84-1] 327-28, 358-60; see also PSAF ¶ 23.)  Ms. Smith met with  HR Director Tracy Bailey (DSMF ¶ 48; Bailey Dep. [84] 17) and "went through everything with her," including telling Ms. Bailey about the videos, images, and texts at issue.  (Smith Dep. [84-1] 358-60; Bailey Dep. [84] 44-45 (recalling Ms. Smith reporting that Mr. Williams showed

her at least one picture and one video).)[19]  The women discussed Mr. Williams's conduct several times over the next week in person and via text message and both believed that Mr. Williams's text with the images of firearms was intimidating. (PSAF ¶ 24, as modified by R-PSAF ¶ 24; <u>see also</u> Smith Dep. [84-1] 181-82, 357-62; Second Smith Decl. [99-1] ¶¶ 23-27, 33.)[20]

On January 7, 2020, Ms. Bailey told Ms. Smith that her husband had lost his job.  (PSAF ¶ 25; Bailey Dep. [84] 48, 99-100; Second Smith Decl. [99-1] ¶ 29.)[21] According to Ms. Smith, "[Ms. Bailey] was afraid to get involved with addressing . . . CEO[ Williams]'s misconduct out of fear of losing her job too

_____

[19] The Court sustains plaintiff's objection to DSMF ¶ 49, proposing that Ms. Bailey did not report Ms. Smith's concerns to anyone else at Eagles Landing based on Ms. Bailey's understanding that she wanted to speak with her husband before proceeding.  DSMF ¶ 49 contradicts Ms. Smith's testimony that she said no such thing.  (<u>See</u> R-DSMF ¶ 49 (citing Smith Dep. [84-1] 362-63).)  The Court may not make credibility determinations at this stage of the litigation and must view the facts relevant to defendants' Motion in the light most favorable to plaintiff. Therefore, the Court must accept Ms. Smith's version of events regarding her conversation with Ms. Bailey.

[20] Despite differences between the deposition testimony of Ms. Smith and Ms. Bailey regarding the conversations and text messages they shared, the Court must credit Ms. Smith's recollection given that the women's exchanges are relevant to defendants' Motion and must be viewed in the light most favorable to plaintiff.

[21] The Court overrules defendants' materiality objection to PSAF ¶ 25, as that proposed fact is relevant to explain Ms. Bailey's lack of action regarding Ms. Smith's complaints about Mr. Williams.

21

because she had no other place to go for work." (Second Smith Decl. [99-1] ¶ 29; <u>see also</u> PSAF ¶ 25.)[22]

When Ms. Bailey told Ms. Smith that she did not want to be involved, Ms. Smith suggested making a complaint via the Eagles Landing Compliance Hotline. (Second Smith Decl. [99-1] ¶ 30.)  However, Ms. Bailey told Ms. Smith that idea would not work because all of those complaints are sent to Ms. Bailey for investigation. (<u>Id.</u>)

Ms. Smith submitted her Resignation Notice on January 10, 2020 with an initial proposed resignation date of February 28, in order to give Eagles Landing time to replace her. (DSMF ¶ 6, as modified by R-DSMF ¶ 6; <u>see also</u> PSAF ¶ 27.) Ms. Smith's notice reads in relevant part as follows:

> Good Morning ELFP Family,
>
> Today I am submitting my Letter of Resignation.  My last day of work will be February 28, 2020.
>
> After sending this e-mail, I will do something that I have not done since I joined the ELFP Family… I will shut off my cellphone.  During my final weeks, I will work to assure that any open items I have with anyone are addressed and open tasks are completed.

---

[22] The Court sustains defendants' objection to PSAF ¶ 26 as stated because it is not supported by the record citations and is redundant of facts already stated. (<u>See</u> R-PSAF ¶ 26.)

I will not come in to the Office today… I have booked a flight to travel to Maryland and will return on Sunday.  I draw strength from going back to where it all began; as I know the next few weeks will be an emotional journey for me as I transition into the next phase of my life.  Today I am stepping out of my "comfort zone"…

I have tried, during my time here, to make a positive difference and that did not always happen without a few hiccups…[smiley-face emoji]  Teamwork is important and as Leaders remember that there is no "I" in TEAM.  You are the foundation that will "shoulder" what is to come.  Communication is key.  Hold each other accountable and encourage one another whenever possible.  When you notice a member of your Team struggling to make progress in their tasks; lend a helping hand.  Take the time to say Thank You and always remember to Lead by example.

People may forget what you said and did, but people will never forget how you made them feel…

Best Wishes,

Towanda Smith, CPA

(Pl.'s Mot. Summ. J. Ex. C [86-5], at 2.)  After submitting her notice, Ms. Smith continued to work at Eagles Landing for two weeks.  (DSMF ¶ 6.)

On January 24, 2020, Ms. Smith attended a meeting with Mr. Williams and Mr. Mitcham at which she raised concerns regarding Mr. Williams's inappropriate behavior.  (DSMF ¶ 7, as modified by R-DSMF ¶ 7; see also PSAF ¶ 28.)[23]  That

_____

[23] Ms. Smith asked Ms. Bailey if she could be present at the meeting, but Ms. Bailey declined to attend because of a planned camping trip and stated that she

23

meeting was the first time Ms. Smith verbally confronted Mr. Williams regarding his inappropriate behavior (Smith Dep. [84-1] 184-85; see also PSAF ¶ 28), although she had reacted disapprovingly to such behavior, such as by shaking her head, putting her head down, putting her hands over hear ears, or saying "Oh, my God." (DSMF ¶ 7, as modified by R-DSMF ¶ 7; Smith Dep. [84-1] 184-85, 200, 226-27, 245-48.)

During the January 24, 2020 meeting, Ms. Smith told Mr. Williams that he had shown her inappropriate images and three inappropriate videos. (DSMF ¶ 8; see also PSAF ¶ 28.) Ms. Smith also addressed Mr. Williams's denial of her medical leave in April 2019, his "concentrated" DNA statement and accompanying dance, his statements about his penis and his father's penis, images she believed to be of Mr. Williams's penis (including a penis in a cake and penis over a toilet), his yelling and outbursts, the images of guns and ammunition, the possibility that a private investigator had been following her, and the emotional injuries she was suffering. (R-DSMF ¶ 8; Smith Dep. [84-1] 338, 368-77; Second Smith Decl. [99-1] ¶ 47 & Ex. 13 [99-1], at 48-53; see also PSAF ¶ 28.)

---

would be available by phone if Ms. Smith needed to call her. (Second Smith Decl. [99-1] ¶ 41.)

According to Ms. Smith, during the meeting and in response to her statements, Mr. Williams "was pretty speechless," his "mouth was sitting wide open like he was in shock," he repeatedly said he had been joking, and he asked her to stop recounting those events. (DSMF ¶ 9, as modified by R-DSMF ¶ 9; Smith Dep. [84-1] 373 ("[Mr. Williams] was just kind of, Don't say that, shh, shh, like he didn't want me to say too much in front of Mr. Mitcham."); see also PSAF ¶ 29.) Mr. Mitcham asked, "[W]hat can he do or what do I need to do[?]" (DSMF ¶ 9; Smith Dep. [84-1] 374.) Ms. Smith decided during the January 24, 2020 meeting to resign effective immediately. (DSMF ¶ 10.) Ms. Smith let Mr. Mitcham know that she needed to go and said, "I don't think this can be fixed," and Mr. Mitchem said that he understood. (Smith Dep. [84-1] 375; PSAF ¶ 29.)[24]

**E.    Ms. Smith's Medical Treatment**

On January 9, 2020 (the day before she sent her resignation notice), Ms. Smith's primary care physician, F. Kennard Hood, M.D., diagnosed her with shingles and asked if she had been under stress lately. (PSAF ¶ 35, as modified by

---

[24] The Court overrules defendants' objection to PSAF ¶ 29 because that proposed fact is supported by the record citation. (See R-PSAF ¶ 29.)

R-PSAF ¶ 35;[25] Hood Dep. [100-2] 13, 48-51.)  Although Ms. Smith did not report her job as a source of stress to Dr. Hood, she believes that her interactions with Mr. Williams and HR's refusal to help her in that regard caused her anxiety and emotional stress and attributes her shingles to those interactions.  (Second Smith Decl. [99-1] ¶ 32.)

Beginning on January 27, 2020, Ms. Smith sought treatment specifically for her mental health.  (PSAF ¶ 36.)  On March 3, 2020, Ms. Smith received a diagnosis of post-traumatic stress disorder ("PTSD") and she has continued to receive psychiatric treatment and therapy.  (Id. ¶ 37.)

**F.    Ms. Smith's Employment Agreement with Eagles Landing**

On May 31, 2016, Ms. Smith and Mr. Williams, on behalf of Eagles Landing as its CEO, entered into the PCA.  (See generally PCA [86-3].)  In Section 1, the parties acknowledge that Ms. Smith via her employment with Eagles Landing would be entrusted and given access to its confidential information (including financial plans and data, management planning information, business plans, and patient information), patient and employee relationships, and goodwill.  (Id. at 2-

---

[25] The Court overrules defendants' materiality objections to PSAF ¶¶ 35 through 37 because those proposed facts are relevant to plaintiff's IIED claim.  (See R-PSAF ¶¶ 35-37.)

3.)  The PCA also states that disclosure or misuse of such confidential information

would materially harm Eagles Landing's legitimate business interests.  (Id. at 2.)

Section 2 of the PCA, titled "Duties," sets forth the following expectations:

> During his/her employment with the Practice, Employee shall (i)
> devote substantially all of his/her business effort, time, energy, and
> skill (reasonable vacations and reasonable absences due to illness
> excepted) to fulfill his/her employment duties; (ii) faithfully, loyally
> and diligently perform such duties; and (iii) diligently follow and
> implement all lawful policies and decisions of the Practice that are
> communicated to Employee.  During his/her employment with the
> Practice, Employee shall not be engaged in or provide services to any
> other business or enterprise (whether engaged in for profit or not)
> which interferes with his/her obligations to the Practice under this
> Agreement.

(PCA [86-3], at 3, 9.)

In Section 3, titled "Definitions," the PCA defines the term "Protective

Covenants" as it is used in the contract to "mean[] the protective covenants

contained in Sections 4 through 7 hereof."  (PCA [86-3], at 4.)  Sections 4 through

7 of the PCA concern:  (4) "Restriction on Disclosure and Use of Confidential

Information"; (5) "Non-Recruitment of Employees and Independent Contractors";

(6) "Non-Disparagement"; and (7) "Return of Materials."  (Id. at 4-6.)

Section 8 of the PCA, titled "Enforcement of Protective Covenants" includes

the following subsection regarding remedies:

> (a)    Rights and Remedies Upon Breach:  The parties specifically
> acknowledge and agree that the remedy at law for any breach of the

27

Protective Covenants will be inadequate and that in the event Employee breaches, or threatens to breach, any of the Protective Covenants, the Practice shall have the right and remedy, without the necessity of proving actual damage or posting any bond to enjoin, preliminarily and permanently, Employee from violating or threatening to violate the Protective Covenants and to have the Protective Covenants specifically enforced by any court of competent jurisdiction, it being agreed that any breach or threatened breach of the Protective Covenants would cause irreparable injury to the Practice and that money damages would not provide an adequate remedy to the Practice. Such rights and remedies shall be in addition to, and not in lieu of, any other rights and remedies available to the Practice at law or in equity, including the Practice's right to seek recovery of all damages resulting from any breach of the Protective Covenants. Employee understands and agrees that if he/she violates any of the obligations set forth in the Protective Covenants, the period of restriction applicable to each obligation violated shall cease to run during the pendency of any litigation over such violation, provided that such litigation was initiated during the period of restriction. Employee understands and agrees that, if the Parties become involved in legal action regarding the enforcement of the Protective Covenants and if the Practice prevails in such legal action, the Practice will be entitled, in addition to any other remedy, to recover from Employee its reasonable costs and attorneys' fees incurred in enforcing such covenants. The Practice's ability to enforce its rights under the Protective Covenants or applicable law against Employee shall not be impaired in any way by the existence of a claim or cause of action on the part of Employee based on, or arising out of this Agreement or any other event or transaction.

(PCA [86-3], at 6.)

In Section 11 of the PCA, the parties confirmed that Ms. Smith was "an 'at will' employee." (PCA [86-3], at 7.) In that regard, the PCA explicitly states:

Nothing in this Agreement shall be construed as a commitment, guarantee, agreement, or understanding of any kind or nature that the

28

> Practice will continue to employ Employee, nor will this Agreement
> affect in any way the right of the Practice to terminate Employee's
> employment at any time and for any reason (unless otherwise agreed
> to by the parties separately in writing).  Employee acknowledges and
> agrees that he/she is an "at will" employee.

(Id.)

Finally, Section 13 of the PCA contains several miscellaneous provisions relevant here.  (See PCA [86-3], at 8-9.)  Section 13(a) contains a choice of law provision and a forum selection clause stating that the contract will be governed by Georgia law and that any disputes shall be brought in this Court or the Superior Court of Henry County, Georgia.  (Id. at 8.)  Section 13(c), regarding waiver, states as follows:

> Failure of either party to insist, in one or more instances, on
> performance by the other in strict accordance with the terms and
> conditions of this Agreement shall not be deemed a waiver or
> relinquishment of any rights granted in this Agreement or of the future
> performance of any such term or condition or of any other term or
> condition of this Agreement, unless such waiver is contained in a
> writing signed by the party making the waiver.

(Id.)  Finally, Section 13(d) states that the PCA contains the entire agreement between the parties with respect to Ms. Smith's employment and supersedes any other written or oral agreement between them on the subject.  (Id.)  Moreover, it permits amendment of the PCA only "by a written agreement executed by the parties hereto or their respective successors and legal representatives."  (Id.)

29

### G.   Ms. Smith's Freelance CPA Business

Since February 2016, Ms. Smith has performed seasonal tax work primarily for friends and family on a freelance basis.  (PSMF ¶ 8.)  While Ms. Smith worked at Eagles Landing, she did not perform any tax services for anyone other than relatives and persons associated with Eagles Landing, except for one client.  (Id. ¶ 9.)  During Ms. Smith's employment with Eagles Landing, Mr. Williams and Dr. Steele received personal tax advice from her and asked her to answer quick tax questions for their nannies.  (Id. ¶ 11, as modified by R-PSMF 11;[26] Smith Decl. [86-4] ¶ 8; Williams Dep. [84-2] 234-35.)  For example, Ms. Smith reviewed nanny Lisa Raspberry's tax returns at the request of Mr. Williams and Dr. Steele.  (Smith Dep. [84-1] 165; Williams Dep. [84-2] 234-35.)

In 2019, nearly all of Ms. Smith's clients were employed by Eagles Landing or related entities; those clients included Eagles Landing's real estate holding companies, Mr. Williams, Dr. Steele, their three nannies (Ms. Raspberry, Carmen Lomele, and Mabel Terrell), and Lisa McDonald (Mr. Williams's assistant).

---

[26] The Court sustains in part Eagles Landing's objection to PSMF ¶ 11 as unsupported by the record citation and includes only that portion of the proposed fact which is supported by Ms. Smith's record citation and which Eagles Landing failed directly to refute.  (See R-PSMF ¶ 11.)

(Smith Decl. [86-4] ¶ 10.)   In 2019, Ms. Smith performed 20 hours of outside accounting work, excluding any services she provided for those linked to Eagles Landing (PSMF ¶ 21), and received $150 in revenue that year (id. ¶ 22, as modified by R-PSMF ¶ 22).   She also performed 56 hours of continuing professional education courses.  (PSMF ¶ 21.)

On August 15, 2019, Ms. Smith spoke with Cheryl Sperling of CPA Site Solutions (which hosted her CPA business website).  (DSAF ¶ 1, as modified R-DSAF ¶ 1; R-PSMF Ex. 6 [96-6], at 5.)  Ms. Sperling's notes from that call state that Ms. Smith "does cfo services single large client-wants to position for tax work-high touch -."  (DSAF ¶ 1, as modified R-DSAF ¶ 1; R-PSMF Ex. 6 [96-6], at 5.)

On September 15, 2019, Ms. Smith emailed Ebony Howard, a fellow CPA, with a list of to-do items related to Ms. Howard joining Ms. Smith's business in some capacity, to which Ms. Howard responded that she was looking forward to partnering with her.   (DSAF ¶ 3.)[27]   Ms. Smith informed Ms. Howard that "[b]eginning the second week of January [2020], I am in my Fayetteville Office

---

[27] The Court overrules plaintiff's materiality objection to DSAF ¶¶ 3 and 4 because those proposed facts are relevant to Eagles Landing's claim that she breached the PCA.  (See R-DSAF ¶¶ 3-4.)

Wednesday-Saturday. . . Many clients do not file until the last minute, so March [2020] is a busy month." (Id. ¶ 4.)

On September 25, 2019, Ms. Smith again spoke with Ms. Sperling, who noted that she "has a plan to ramp up for tax season- hiring staff n[e]xt step will be marketing." (DSAF ¶ 2; R-PSMF Ex. 6 [96-6], at 5.)[28]

On October 3, 2019, Ms. Smith reached out to Marie Dietrich via email about potentially working for Ms. Smith's business. (DSAF ¶ 5; R-PSMF Ex. 8 [96-8], at 1.)[29] In her email, Ms. Smith asked Ms. Dietrich which days and times she would be available to work on projects for her and how she preferred to be paid. (DSAF ¶ 5; R-PSMF Ex. 8 [96-8], at 1.)

In the fall of 2019, Ms. Smith had an official logo created for her business. (DSAF ¶ 9; R-PSMF Ex. 9 [96-9], at 1.)[30] Ms. Smith paid $500 to have her logo

---

[28] The Court overrules plaintiff's materiality objection to DSAF ¶ 2 because that proposed fact is relevant to Eagles Landing's claim that she breached the PCA. (See R-DSAF ¶ 2.)

[29] The Court overrules plaintiff's materiality objection to DSAF ¶¶ 5 and 6 because those proposed facts are relevant to Eagles Landing's claim that she breached the PCA. (See R-DSAF ¶¶ 5-6.)

[30] The Court overrules plaintiff's materiality objection to DSAF ¶ 9 because that proposed fact is relevant to Eagles Landing's claim that she breached the PCA. (See R-DSAF ¶ 9.)

32

displayed at football games for her son's school and she expressed concern about how prominent the placement of her advertisement would be to attendees and anyone who drove by the school.  (DSAF ¶ 10; R-PSMF Ex. 10 [96-10], at 1-2.)[31]

### H.    Ms. Smith's Performance as Eagles Landing's Controller[32]

After March 2019, Mr. Williams and his assistant, Ms. McDonald, had a difficult time getting in touch with Ms. Smith during normal business hours. (DSAF ¶ 14, as modified by R-DSAF ¶ 14; Williams Decl. [96-2] ¶ 13; McDonald Decl. [96-3] ¶¶ 6-7.)  Mr. Williams received delayed responses to emails and phone calls.  (DSAF ¶ 17, as modified by R-DSAF ¶ 17; Williams Decl. [96-2] ¶ 13.) According to Mr. Williams, Ms. Smith skipped internal meetings, requested that a meeting be converted to a phone call so that she would not have to come to the office, and even skipped meetings she had scheduled.  (DSAF ¶¶ 18-19, as

---

[31] The Court overrules plaintiff's materiality objection to DSAF ¶ 10 because that proposed fact is relevant to Eagles Landing's claim that she breached the PCA. (See R-DSAF ¶ 10.)

[32] Eagles Landing bases its counterclaim for breach of contract on Ms. Smith's alleged violations of the PCA, outside business endeavors, poor performance, and absenteeism.  (See Defs.' Answer & Countercl. [10] ¶¶ 1-21, at 15-19.)  Because plaintiff seeks summary judgment on that counterclaim, the Court must view the related facts in a light most favorable to Eagles Landing as the non-movant.  However, the Court must view the facts regarding the frequency and content of Ms. Smith's interactions with Mr. Williams in a light most favorable to her when ruling on defendants' Motion for Summary Judgment.

modified by R-DSAF ¶¶ 18-19; Williams Decl. [96-2] ¶ 13; McDonald Decl. [96-3] ¶ 7.)  Additionally, the quality of Ms. Smith's work declined.  (DSAF ¶ 24.)[33]

Between March 2019 and the summer of 2019, Ms. McDonald did not see Ms. Smith in the office at all.  (McDonald Decl. [96-3] ¶ 6.)  Mr. Williams expressed his concerns to Ms. McDonald about whether Ms. Smith was providing proper assistance to Eagles Landing's accountants regarding tax preparation and other items.  (Id. ¶ 7.)  For example, plaintiff had ultimate responsibility for supervising Eagles Landing's payroll process and was expected to work with team members on payroll preparation, be available to answer questions, and review payroll to catch errors before they occurred.  (DSAF ¶ 25.)[34]  After Ms. Smith left Eagles Landing's offices in March 2019, she spent minimal time supervising that process and failed to prevent or timely correct numerous errors that Eagles Landing

---

[33] The Court overrules plaintiff's objection to DSAF ¶ 24 as argumentative. (See R-DSAF ¶ 24.)

[34] The Court overrules plaintiff's objections to DSAF ¶¶ 25 and 26 as argumentative.  (See R-DSAF ¶¶ 25-26.)

34

thereafter experienced, including with respect to payroll and benefits being paid to former employees or individuals who had not yet started employment.  (Id. ¶ 26.)[35]

In June 2019, Ms. Smith solicited proposals from Bennett Thrasher (Eagles Landing's outside accounting firm) to implement a financial system integration project and to outsource some of Ms. Smith's accounting duties.  (DSAF ¶ 20.)[36] However, when Bennett Thrasher contacted Ms. Smith in the summer of 2019, she was unavailable for weeks at a time.  (Id. ¶ 22.)[37]  Bennett Thrasher also had to prepare or finalize work that Ms. Smith should have been responsible for and she stopped entering the level of detail into Eagles Landing's accounting systems that

---

[35] The Court sustains plaintiff's objections to DSAF ¶¶ 27 and 28 because those proposed facts are not supported by the record citations and state legal conclusions.  (See R-DSAF ¶¶ 27-28.)

[36] The Court overrules plaintiff's objection to DSAF ¶ 20 because that proposed fact is supported by the record citation.  (See R-DSAF ¶ 20.)  However, the Court sustains plaintiff's objection to DSAF ¶ 21, regarding fees incurred for the Bennett Thrasher project, because she has directly refuted that proposed fact. (See R-DSAF ¶ 21, citing Bennett Thrasher Decl. [87-4] (declaring that it did not bill or charge Eagles Landing in any amount for work on the project).)

[37] The Court overrules plaintiff's objection to DSAF ¶ 22 as argumentative. (See R-DSAF ¶ 22.)

she had previously entered with respect to electronic medical records and billing. (Id. ¶ 23.)[38]

By the summer of 2019, it was apparent to Mr. Williams that Ms. Smith needed to be in the office to adequately perform her job duties, and both he and Ms. McDonald stated that to her.  (DSAF ¶ 15; Williams Decl. [96-2] ¶ 14; McDonald Decl. [96-3] ¶ 8.)[39]  Despite those conversations, Mr. Williams and Ms. McDonald almost never saw Ms. Smith at Eagles Landing's offices during normal business hours between March 2019 and December 2019.  (DSAF ¶ 16, as modified by R-DSAF ¶ 16; Williams Decl. [96-2] ¶¶ 12-14; McDonald Decl. [96-3] ¶¶ 6-9.)

## I.    Ms. Smith's Complaint and Eagles Landing's Counterclaim

Count I of the Complaint alleges Eagles Landing violated Ms. Smith's rights under Title VII by subjecting her to a sexually hostile work environment via Mr. Williams's unwelcome sexual harassment.  (Compl. ¶¶ 56-64.)  In Count II, the Complaint alleges that Eagles Landing retaliated against Ms. Smith for opposing

---

[38] The Court overrules plaintiff's objection to DSAF ¶ 23 as argumentative. (See R-DSAF ¶ 23.)

[39] The Court overrules plaintiff's objections to DSAF ¶¶ 15 and 16 because those proposed facts are supported by the record citations and the Court must view the facts regarding her alleged performance issues and availability in a light most favorable to Eagles Landing given that they are relevant to her Motion for Summary Judgment.  (See R-DSAF ¶¶ 15-16.)

Mr. Williams's harassment when he texted her the image of a handgun and ammunition after she rebuffed him.  (Id. ¶¶ 66-73.)  In Count III, Ms. Smith alleges that Mr. Williams's conduct, as ratified by Eagles Landing (i.e., the alleged hostile work environment and retaliatory text message), amounted to constructive discharge because a reasonable person working under those conditions would have felt compelled to resign.  (Id. ¶¶ 74-76.)  In Count IV, the Complaint alleges that Mr. Williams's conduct constitutes IIED.  (Id. ¶¶ 77-81.)  In Count V, Ms. Smith demands punitive damages against Mr. Williams.  (Id. ¶¶ 82-84.)  Additionally, Ms. Smith seeks general and compensatory damages (including for pain and suffering, medical expenses, and lost earnings), as well as attorney's fees and costs, and punitive/exemplary damages.  (Id. ¶¶ 62-64, 71-73, 76, 81, I-XI.)

Eagles Landing alleges a counterclaim against Ms. Smith for breach of the PCA.  (See Defs.' Answer & Countercl. [10] ¶¶ 16-21, at 18-19.)  Eagles Landing contends that Ms. Smith breached the PCA in 2019 by engaging in a separate business enterprise that interfered with her obligations to it and resulted in her failure to fulfill her employment duties.  (Id. ¶¶ 3-19, at 16-19.)  Eagles Landing alleges that it suffered monetary damages as a result of Ms. Smith's breach and that it is entitled to recover reasonable attorney's fees and costs pursuant to Section 8(a) of the PCA and costs incurred to address the alleged breach.  (Id. ¶¶ 20-21, at 19.)

II.   **STANDARD OF REVIEW**

A "court shall grant summary judgment if the movant shows that there is no genuine dispute to any material fact and the movant is entitled to judgment as a matter of law." See Fed. R. Civ. P. 56(a).  The party moving for summary judgment bears the initial burden of "informing the court of the basis for its motion and of identifying those materials that demonstrate the absence of a genuine issue of material fact." Rice-Lamar v. City of Fort Lauderdale, 232 F.3d 836, 840 (11th Cir. 2000) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  Those materials may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  "Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment."  Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).

The non-moving party is then required "to go beyond the pleadings" and present competent evidence "showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324.  Generally, "[t]he mere existence of a scintilla of evidence" supporting the non-movant's case is insufficient to defeat a motion for summary

judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  If in response the non-moving party does not sufficiently support an essential element of his case as to which he bears the burden of proof, summary judgment is appropriate.  Rice-Lamar, 232 F.3d at 840.  "In determining whether genuine issues of material fact exist, [the Court] resolve[s] all ambiguities and draw[s] all justifiable inferences in favor of the non-moving party."  Id. (citing Anderson, 477 U.S. at 255).

In deciding a summary judgment motion, the court's function is not to resolve issues of material fact but rather to determine whether there are any such issues to be tried.  Anderson, 477 U.S. at 251.  The applicable substantive law will identify those facts that are material.  Id. at 248.  Facts that are disputed, but which do not affect the outcome of the case, are not material and thus will not preclude the entry of summary judgment.  Id.  Genuine disputes are those in which "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.  For factual issues to be "genuine," they must have a real basis in the record.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  When the record as a whole could not lead a rational trier of fact to find for the non-movant, there is no "genuine issue for trial."  Id. at 587.

39

## III.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants seek entry of summary judgment on Ms. Smith's claims under Title VII for sexually hostile work environment (Count I); retaliation (Count II); constructive discharge (Count III); and on her state law claims against Mr. Williams for IIED (Count IV) and punitive damages (Count V).  (See generally Defs.' Mem. [80-1]; Defs.' Reply [106].)  The Court addresses each of those claim in turn below.

### A.   Ms. Smith's Sexually Hostile Work Environment Claim (Count I)

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Although this provision does not mention a sexually hostile work environment, courts have recognized that "'[t]he phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to strike at the entire spectrum of disparate treatment of men and women in employment,' which includes requiring people to work in a discriminatorily hostile or abusive environment."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986) (some internal quotation marks omitted)).

40

To establish a sexually hostile work environment claim under Title VII based on harassment by a supervisor, an employee must show:  (1) that she belongs to a protected group; (2) that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature; (3) that the harassment was based on the sex of the employee; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable.  Mendoza v. Borden, Inc., 195 F.3d 1238, 1245 (11th. Cir. 1999) (en banc).

Defendants contend that Ms. Smith has not created triable issues on the third and fourth elements listed above.  Specifically, they argue that Ms. Smith cannot establish that Mr. Williams's alleged conduct was based on her sex, or that any such conduct was sufficiently severe or pervasive to alter the conditions of her employment.  (Defs.' Mem. [80-1] 9-17; Defs.' Reply [106] 8-14.)  Ms. Smith disagrees with those arguments.  (Pl.'s Resp. [97] 20-27.)

### 1.    Mr. Williams's Conduct Was Based on Sex

Defendants argue that Ms. Smith alleges Mr. Williams engaged in three kinds of behaviors:  (1) generic yelling and cursing in the office; (2) gender-neutral comments regarding sexual activity; and (3) showing no more than three videos

41

and four images or memes containing adult content.  (Defs.' Mem. [80-1] 10-12; Defs.' Reply [106] 9-10.)  Defendants argue that Ms. Smith cannot establish that any of Mr. Williams's conduct was "based on" Ms. Smith's sex because the content "consisted of generic sexual connotation and related acts that had nothing to do with Plaintiff's gender" and which presumably would be offensive to women and men alike. (Defs.' Mem. [80-1] 10-11.)  According to defendants, the first category above involved general "venting" directed at no one in particular, and the other two categories were merely generic, gender-neutral comments, images, memes, and videos about sexual activity and unrelated to Ms. Smith or her gender.  (Id.)  Finally, defendants emphasize that Mr. Williams never touched or propositioned Ms. Smith or targeted her with derogatory or demeaning comments.  (Id. at 11.)

Defendants' assertion that the statements, pictures, and videos Mr. Williams shared with Ms. Smith, which included pornography, were gender neutral is not well taken.  Additionally, defendants' focus on whether Mr. Williams's behavior was an attempt to seduce Ms. Smith misses the point of what constitutes a sexually hostile work environment.  "'The critical issue, Title VII's text indicates, is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'"  Oncale v.

42

<u>Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 80 (1998) (quoting <u>Harris</u>, 510 U.S. at 25).

In <u>Oncale</u>, the Supreme Court outlined three ways a plaintiff can show that the conduct to which she was allegedly subject was based on sex:  (1) the challenged conduct was motivated by sexual desire; (2) she was harassed "in such sex specific and derogatory terms . . . as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace"; or (3) "direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace."  523 U.S. at 80-81.

Viewing the facts in the light most favorable to Ms. Smith, as the Court must with regard to defendants' Motion, she has raised a triable issue over whether Mr. Williams's conduct was based on her sex.  A reasonable jury could find that Mr. Williams was motivated by her sex given that he reserved his comments about adult sexual activity and erotic pictures, memes, and videos for female employees. Notably, several female employees other than Ms. Smith were exposed to Mr. Williams's behavior.  (<u>See</u> PSAF ¶ 8, as modified by R-PSAF ¶ 8; Williams Dep. [84-2] 200-01; McDonald Dep. [89-4] 51, 56; Grady Dep. [102-1] 19-37, 54-55, 90; Wright Dep. [89-3] 60.)  However, the parties agree that Mr. Williams did not engage in that behavior in front of male employees.  (PSAF ¶ 9.)  Thus, there is a

disputed issue of material fact over whether Mr. Williams exposed Ms. Smith to disadvantageous terms or conditions of employment via his weekly sex-based conduct.[40]

### 2.    Mr. Williams's Conduct was Severe and Pervasive

The Eleventh Circuit has stated that the "severe or pervasive" requirement "is the element that tests the mettle of most sexual harassment claims."  Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 583 (11th Cir. 2000), abrogated on other grounds as recognized by Crawford v. Carroll, 529 F.3d 961, 974 (11th Cir. 2008) (citation omitted).  Determining whether the alleged conduct or comments are severe or pervasive such that they alter the terms and conditions of a plaintiff's employment involves a two-pronged inquiry:  (1) whether the employee subjectively perceived the harassing conduct as severe or pervasive; and, if so, (2) whether the employee's perception is objectively reasonable.  Mendoza, 195 F.3d at 1246.

---

[40] In Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798 (11th Cir. 2010) (en banc), the Circuit reversed a summary judgment that had been entered for the defendant because the "derogatory language in the office was not directed at [the plaintiff] in particular." Id. at 806.  The Circuit held that "words and conduct that are sufficiently gender-specific and either severe or pervasive may state a claim of a hostile work environment, even if the words are not directed specifically at the plaintiff." Id. at 811.  Here, the varied forms of communication attributed to Mr. Williams are sufficiently gender specific.

For the purposes of this Motion, defendants do not challenge whether Ms. Smith subjectively perceived the behavior at issue to be severe or pervasive.  Rather, defendants contend that no objectively reasonable person in her position would reach that conclusion.  Thus, the Court must determine whether the facts suggest that a reasonable person in Ms. Smith's position would find the harassment severe or pervasive.  Johnson v. Booker T. Wash. Broad. Serv., Inc., 234 F.3d 501, 509 (11th Cir. 2000).  "This 'inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target.'"  Wilborn v. S. Union State Cmty. Coll., 720 F. Supp. 2d 1274, 1296 (M.D. Ala. 2010) (quoting Oncale, 523 U.S. at 81).

A court must consider "four factors when evaluating whether harassment was objectively hostile:  '(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance.'"[41]  Fernandez v. Trees, Inc., 961 F.3d 1148, 1153

---

[41] In their reply, defendants clarify that for the purposes of summary judgment only they do not contest element four above and believe that Ms. Smith would not be able to establish any elements of her hostile work environment claim at trial.  (Defs.' Reply [106] 12 n.2.)

(11th Cir. 2020) (quoting Mendoza, 195 F.3d at 1246).  Although these factors help

guide the inquiry, "the objective element is not subject to mathematical precision."

Bryant v. Jones, 575 F.3d 1281, 1297 (11th Cir. 2009).  The Court must view the

evidence "both cumulatively and in the totality of the circumstances."  Reeves, 594

F.3d at 808.

In analyzing the "sufficiently severe or pervasive" element of a sexual

harassment case, courts emphasize that Title VII is not a federal "'civility code.'"

Mendoza, 195 F.3d at 1245 (quoting Oncale, 523 U.S. at 81); see also Jones v. UPS

Ground Freight, 683 F.3d 1283, 1297 (11th Cir. 2012) ("It is a bedrock principle

that not all objectionable conduct or language amounts to discrimination under

Title VII." (quotation marks and citation omitted)).  Along this line, the Eleventh

Circuit's en banc opinion in Reeves made clear the following:

> [W]e reaffirm the bedrock principle that not all objectionable conduct
> or language amounts to discrimination under Title VII.  Although
> gender-specific language that imposes a change in the terms or
> conditions of employment based on sex will violate Title VII, general
> vulgarity or references to sex that are indiscriminate in nature will not,
> standing alone, generally be actionable.

Reeves, 594 F.3d at 809.

With these standards in mind, the Court turns to Ms. Smith's allegations to

determine whether Mr. Williams's behavior, judged from the perspective of a

reasonable person in her position, created a sexually hostile work environment

46

based on (1) frequency; (2) severity; and (3) whether it was physically threatening or humiliating or mere offensive utterances.

The frequency factor weighs in Ms. Smith's favor. She alleges that Mr. Williams exposed her to sexually-inappropriate behavior, comments, and/or visuals weekly from August 2019 to December 2019. (Pl.'s Resp. [97] 24-25.) More specifically, accepting Ms. Smith's testimony, over that five-month period, Mr. Williams     sporadically made his "concentrated" DNA statement and performed the accompanying dance, shared at least 10 stories/comments regarding his and his father's genitalia, his sexual exploits or thoughts on sex, and the exploits of his friends and relatives. Mr. Williams also repeatedly shared his "baby" picture with Ms. Smith, as well as exposed her to multiple pictures of women with various pronounced body parts, and two pictures of a penis which she suspected to be his. Finally, Mr. Williams exposed her to three videos with explicit sexual content or language. Thus, Mr. Williams harassed Ms. Smith at approximately the same frequency (if not more) as did the defendant in Johnson, who exposed his co-worker to 15 separate instances of harassment over four months, which the Eleventh Circuit found sufficient to establish the first factor. 234 F.3d at 509.

With regard to severity, the Court notes that (fortunately) there is no probative evidence showing that Mr. Williams ever touched Ms. Smith, made

explicit sexual advances toward her, or made requests for sexual favors from her. Instead, he engaged in the behaviors summarized above.  That Mr. Williams never touched Ms. Smith is relevant because "harassment involving an element of physical invasion is more severe than harassing comments alone."  Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 334 (6th Cir. 2008) (internal quotation marks and citation omitted).  Numerous cases in this Circuit replete with comments and touching were found to fall short of the threshold level of "severe or pervasive."

For example, in Gupta, the harasser placed his hand on the inside of the plaintiff's thigh, lifted the hem of her dress, unbuckled his pants and tucked in his shirt in front of her, stared at her twice, called her frequently at home, told her she looked beautiful, and repeatedly asked her to lunch, but the court held that this conduct did not meet the severe or pervasive requirement.  212 F.3d at 584-86. Similarly, in Mendoza the Eleventh Circuit rejected the plaintiff's claim that she was subjected to a sexually hostile work environment where she identified the following comments and conduct:

> (1) one instance in which Page said to Mendoza "I'm getting fired up"; (2) one occasion in which Page rubbed his hip against Mendoza's hip while touching her shoulder and smiling; (3) two instances in which Page made a sniffing sound while looking at Mendoza's groin area and one instance of sniffing without looking at her groin; and (4) Page's "constant" following and staring at Mendoza in a "very obvious fashion."

48

195 F.3d at 1247; see also Guthrie v. Waffle House, Inc., 460 F. App'x 803, 807-08 (11th Cir. 2012) (per curiam) (harasser "grabbed" the plaintiff's buttocks on two occasions; "talked dirty" to her, including "saying five times that he wanted to 'fuck' her and 'lick' her 'all over'"; and asked the plaintiff on a date "10 to 20 times," but court held that this conduct fell short of the severe or pervasive standard); Lockett v. Choice Hotels Int'l, Inc., 315 F. App'x 862, 866 (11th Cir. 2009) (per curiam) (alleged sexual remarks and two incidents of brief touching over four-month period fall below the minimum level of severity or humiliation needed to establish sexual harassment); Mitchell v. Pope, 189 F. App'x 911, 913-14 (11th Cir. 2006) (per curiam) (affirming summary judgment where, over four year period, supervisor made 13 inappropriate comments and committed three unwanted touchings—including attempting to kiss plaintiff, lifting her over his head, and rubbing against her and reaching across her chest).

What separates Ms. Smith's work environment from those the Circuit found unactionable is the severity of the explicit content Mr. Williams described to and showed her. Here, Mr. Williams regularly directed similar shocking content to that outlined above to Ms. Smith while they were alone in his office with the door closed. For example, Mr. Williams: performed a racist and vulgar "joke" and dance concerning the size of his penis; bragged about the size of his penis and his father's

49

penis; made vulgar references to sexual acts, such as "all dicks feel bigger in the ass" and "white men pass on fucking" overweight women; described in detail the sexual escapades of himself and his friends including his involvement in a "threesome," his wife's reaction during sex, his father-in-law's tryst, his friend who had his "penis sucked by [a] man," "doggie style" sex he witnessed complete with moaning sounds; revealed his diagnosis of vitiligo on the penis in the shape of a penis; showed Ms. Smith multiple pictures of erect penises (possibly including his) and women with pronounced features; and showed Ms. Smith at least one female pornographic video, in addition to 2 other sexually-explicit videos.

Furthermore, Ms. Smith had no escape from those explicit sex-based comments, behaviors, pictures, and videos, which Mr. Williams (her supervisor and Eagles Landing's CEO/co-owner) foisted upon her "out of the blue" while she was speaking with him alone in his office with the door closed about financial business matters. (See DSMF ¶ 36, as modified R-DSMF ¶ 36; Smith Dep. [84-1] 228-30, 232 (Mr. Williams's behavior came "out of the blue").) Although Ms. Smith could leave his office, the damage had already been done, i.e., he had already sexually harassed her. As the en banc Circuit explained in Reeves, "[a] member of a protected group cannot be forced to endure pervasive, derogatory conduct and

50

references that are gender-specific in the workplace." 594 F.3d at 810. Thus, Ms. Smith can establish that Mr. Williams's conduct was severe or pervasive.

Finally, although defendants argue that Mr. Williams's alleged comments and behavior was neither physically threatening nor humiliating (Defs.' Mem. [80-1] 17), a reasonable jury could disagree. Mr. Williams's behavior "scared" and "embarrassed" Ms. Smith. (Smith Dep. [84-1] 257.) Additionally, she interpreted his text message with the handguns and ammunition as a threat for rebuking Mr. Williams after he showed her a third sexually-explicit video. (DSMF ¶ 46, as modified by R-DSMF ¶ 46; Pl.'s Resp. to Defs.' Interrog. No. 19 [80-15]; Smith Dep. [84-1] 333-34; see also PSAF ¶ 21.) More importantly, a jury could conclude that Mr. Williams's behavior would be humiliating to a reasonable person in Ms. Smith's position alone in an office with a powerful man holding the rarefied position of supervisor, CEO, and co-owner, and that his text message was threatening under the circumstances. Certainly, Ms. Smith has proffered sufficient evidence when viewed in a light most favorable to her to establish the third factor.

In sum, the undersigned **REPORTS** that there are disputed issues of material fact over whether Ms. Smith was subjected to a sexually hostile work environment. Considering the totality of the circumstances, the factors at issue weigh in Ms. Smith's favor regarding her claim that the work environment at Eagles Landing

was objectively hostile and altered the terms and conditions of her employment based on sex.   Accordingly, the undersigned **RECOMENDS** that Defendants' Motion for Summary Judgment on Ms. Smith's Title VII claim set forth in Count I be **DENIED**.

### B.       Ms. Smith's Retaliation Claim (Count II)

In the absence of direct evidence, retaliation claims are analyzed under the same <u>McDonnell Douglas</u> burden-shifting framework as discrimination claims, which means that the plaintiff must first establish a prima facie case.  <u>See</u> <u>Olmsted v. Taco Bell Corp.</u>, 141 F.3d 1457, 1460 (11th Cir. 1998).  A prima facie case for a retaliation claim requires plaintiff to establish that (1) she engaged in protected activity, (2) she suffered a materially adverse employment action, and (3) there was a causal connection between the two events.  <u>Manley v. DeKalb Cnty., Ga.</u>, 587 F. App'x 507, 512 (11th Cir. 2014) (per curiam).

With regard to the first element,

> [a]n employee is protected from discrimination if (1) "he has opposed any practice made an unlawful employment practice by this subchapter" (the opposition clause) or (2) "he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter" (the participation clause).

<u>Clover v. Total Sys. Servs., Inc.</u>, 176 F.3d 1346, 1350 (11th Cir. 1999) (quoting 42 U.S.C. § 2000e-3(a)).  Because Ms. Smith had not filed a charge of discrimination

at the time she resigned, her claim arises (if at all) under the opposition clause.  See Muhammad v. Audio Visual Servs. Grp., 380 F. App'x 864, 872 (11th Cir. 2010) (per curiam) (opposition clause protects activity that occurs before the filing of a charge with the EEOC, such as submitting an internal complaint of discrimination to an employer or informally complaining of discrimination to a supervisor).

In an opposition clause claim, a plaintiff must demonstrate "a good faith, reasonable belief that the employer was engaged in unlawful employment practices."  Little v. United Techs., Carrier Transicold Div., 103 F.3d 956, 960 (11th Cir. 1997).  A plaintiff "must not only show that he *subjectively* . . . believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented."  Id. "The objective reasonableness of an employee's belief that her employer engaged in an unlawful employment practice must be measured against existing substantive law."  Clover, 176 F.3d at 1351.

Additionally, an adverse employment action in the context of a retaliation claim is one that causes a serious and material change in the terms, conditions, or privileges of employment and "'must be harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination.'"  Clark v. S. Broward Hosp. Dist., 601 F. App'x 886, 891-92 (11th

53

Cir. 2015) (per curiam) (quoting Burlington, 548 U.S. at 57).  With regard to the third element, a plaintiff satisfies it if she provides sufficient evidence that the decision maker was aware of the protected conduct and that there was close temporal proximity between this awareness and the adverse employment action. Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1337 (11th Cir. 1999).

Ms. Smith alleges that she complained to Mr. Williams regarding his behavior in April 2019 (via two conversations days apart) and again on December 30, 2019, which resulted in his retaliating against her.  (See Compl. [1] ¶¶ 65-73; Pl.'s Resp. [97] 27.)  She contends that Mr. Williams first retaliated against her after she complained to him in April 2019 about his yelling and cursing by subjecting her to sexual harassment beginning in July 2019.  (Pl.'s Resp. [97] 27.) She also alleges that Mr. Williams retaliated against her again via a text message with pictures of guns and ammunition sent immediately after she rebuked him on December 30, 2019 for showing her a third sexually-explicit video.  (Id. at 27.)

With regard to Ms. Smith's first oppositional act, Mr. Williams's yelling and cursing generally can be characterized as gender-neutral vulgarity and an objectively reasonable employee would not consider it an unlawful employment practice in violation of Title VII.  Moreover, Ms. Smith has failed to proffer evidence of a causal connection between her April 2019 complaint and the alleged

54

sexual harassment, which did not start until roughly four to five months later in July or August 2019.  See Johnson v. Miami-Dade Cnty., 948 F.3d 1318, 1327-28 (11th Cir. 2020) (per curiam) (explaining that, without more, mere temporal proximity must be very close to suggest causation and finding a three-to-four month disparity insufficient).  Thus, Ms. Smith has failed to establish a prima facia case of retaliation with regard to her April 2019 conversation with Mr. Williams.

With regard to Ms. Smith's second oppositional act, she contends that in response to a sexually-explicit video Mr. Williams showed her on December 30, 2019, she told him, "I don't know what's worse, the person who recorded it or the person who's showing it," and Mr. Williams looked confused and put his phone down.  (DSMF ¶ 41; Smith Dep. [84-1] 315; see also PSAF ¶ 20.)  Shortly thereafter, Mr. Williams sent her images of two handguns and ammunition via text message.  (DSMF ¶ 44, as modified by R-DSMF ¶ 44; Smith Dep. [84-1] 318-21 & Ex. 19 [80-8]; see also PSAF ¶ 21.)  If that video had been the only one Mr. Williams had ever shown Ms. Smith, then the substantive law would hold that her opposition was not protected activity.  However, Mr. Williams had been exposing Ms. Smith to sexually-explicit material and statements regularly for months.

Therefore, a triable issue exists over whether Ms. Smith's rebuke of Mr. Williams (especially in light of his adverse reaction to her and subsequent text

message) was protected activity.  See Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178-80 (2d Cir. 1996) (complaint about a co-worker's sexually-vulgar comment could be protected activity where plaintiff could have had a reasonable belief that it contributed to the creation of a sexually hostile work environment in light of earlier sexually discriminatory remarks and conduct, even if one could not reasonably think that the final comment alone violated Title VII); Livingston v. Marion Bank & Tr. Co., 30 F. Supp. 3d 1285, 1316 (N.D. Ala. 2014) (complaint made to the harassing supervisor, accompanied by a demand that he cease engaging in sexually harassing conduct generally, may be protected where the employee could reasonably believe that the supervisor's harassment, viewed cumulatively, was unlawful under Title VII).

Given that Ms. Smith may have engaged in protected activity, the issue becomes whether she can establish the second and third elements of her prima facie retaliation case, i.e., whether she suffered a materially adverse employment action and a causal connection between those two events.  With regard to adverse employment actions, "the type of employer conduct considered actionable [in a retaliation context] has been broadened from that which adversely affects the plaintiff's conditions of employment or employment status to that which has a materially adverse effect on the plaintiff, irrespective of whether it is employment

56

or workplace-related." <u>Crawford</u>, 529 F.3d at 973.  A materially adverse action means one that might have dissuaded a reasonable employee from making or supporting a charge of discrimination.  <u>Id.</u>

Here, Mr. Williams's text message to Ms. Smith reasonably could be considered "harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination.'"  <u>Clark</u>, 601 F. App'x at 891-92 (quoting <u>Burlington</u>, 548 U.S. at 57).  A jury could find that a reasonable employee in the particular circumstances here (faced with a veiled threat from her supervisor who also holds the positions of CEO and co-owner) would find such a communication materially adverse, i.e., it would dissuade the employee from making or supporting a charge of discrimination.  Finally, viewing the facts in a light most favorable to Ms. Smith, she can establish a causal connection between her December 30, 2019 opposition to Mr. Williams's behavior and the threatening text message he sent to her shortly thereafter.

Because Ms. Smith can establish a prima facie case of retaliation, defendants bear the "exceedingly light burden" of articulating a legitimate, non-retaliatory reason for Mr. Williams's text.  <u>See</u> <u>Tolar v. Bradley Arant Boult Commings, LLP</u>, 997 F.3d 1280, 1297 (11th Cir. 2021) (internal quotation marks and citation omitted).  According to Mr. Williams, he had purchased the guns the weekend

before and simply shared images of them with Ms. Smith via text in response to their conversation regarding what they had done over the holiday weekend.  (See Williams Dep. [84-2] 82-83.)   Mr. Williams's explanation serves to meet defendants' burden and the inference of retaliation drops; however, Ms. Smith may raise a triable issue over whether that reason is pretext.

To establish pretext, a plaintiff "must demonstrate that the proffered reason was not the true reason for the employment decision." Jackson v. Ala. State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005) (internal quotation marks and citation omitted).  "Reasons are pretextual only if (1) the reasons were false and (2) retaliation was the real reason for the employment decision." Mealing v. Ga. Dep't of Juv. Just., 564 F. App'x 421, 427 (11th Cir. 2014) (per curiam) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)).

Notably, Ms. Smith denies that she ever had a conversation with Mr. Williams on December 30, 2019 regarding guns.  (Second Smith Decl. [99-1] ¶ 17.)  Rather, she interpreted Mr. Williams's text message as retaliation for rebuking him after he showed her yet another sexually explicit video.  (Id.)  Thus, there is probative evidence in the record from which a reasonable jury could conclude that defendants' proffered reason is false.

Therefore, disputed issues of material fact exist regarding whether Mr. Williams retaliated against Ms. Smith with a threatening text message for her protected conduct on December 30, 2019. Accordingly, the undersigned **RECOMMENDS** that Defendants' Motion for Summary Judgment be **DENIED** as to Ms. Smith's Title VII retaliation claim set forth in Count II.

### C. Ms. Smith's Constructive Discharge Claim (Count III)

"Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job." Bryant v. Jones, 575 F.3d 1281, 1298 (11th Cir. 2009) (internal quotation marks and citation omitted); see also Hill v. Winn-Dixie Stores, Inc., 934 F.2d 1518, 1527 (11th Cir. 1991) ("Before finding a constructive discharge, this court has traditionally required a high degree of deterioration in an employee's working conditions, approaching the level of 'intolerable.'"). In assessing constructive discharge claims, the court is not to consider a plaintiff's subjective feelings about her employer's actions. Rather, the court must solely determine whether a reasonable person in the plaintiff's position would be compelled to resign. Doe v. DeKalb Cnty. Sch. Dist., 145 F.3d 1441, 1450 (11th Cir. 1998).

Moreover, "[t]he threshold for establishing constructive discharge . . . is quite high." Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1231 (11th Cir.

2001) (per curiam).  "Before finding a constructive discharge, the Eleventh Circuit requires 'pervasive conduct by employers' . . . and 'a high degree of deterioration in an employee's working conditions.'"  Mangrum v. Republic Indus., Inc., 260 F. Supp. 2d 1229, 1252 (N.D. Ga. 2003) (quoting Hipp, 252 F.3d at 1231, and Hill, 934 F.2d at 1527), aff'd, 88 F. App'x. 390 (11th Cir. 2003) (table decision).  Thus, to prove constructive discharge, the plaintiff must demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment.  Landgraf v. USI Film Prods., 968 F.2d 427, 430 (5th Cir. 1992), aff'd on other ground, 511 U.S. 244 (1994); Mangrum, 260 F. Supp. 2d at 1252 (noting that this standard is "'higher than the standard for proving a hostile work environment'") (quoting Hipp, 252 F.3d at 1231); see also Steele v. Offshore Shipbuilding, Inc., 867 F.2d 1311, 1316-18 (11th Cir. 1989) (affirming district court's conclusion that Title VII plaintiffs were subjected to hostile work environment but not constructively discharged).

Defendants argue that Ms. Smith's constructive discharge claim fails because she has no evidence that Mr. Williams or anyone else at Eagles Landing wanted her to resign or acted with that purpose.  (Defs.' Mem. [80-1] 21; Defs.' Reply [106] 18.)  According to defendants, Ms. Smith's allegations fall short of the high bar set for establishing a work environment so intolerable as to force her

resignation.  (Defs.' Reply [106] 18.)  Defendants also point to Ms. Smith's intent to work an additional seven weeks after her January 10, 2020 Resignation Notice and her complimentary statements about working at Eagles Landing, describing it as her "comfort zone" and including a smiley-face emoji.  (Defs.' Mem. [80-1] 21; Defs.' Reply [106] 18.)

The record summarized supra Parts III.A.1-2, describes the frequent sexually-explicit comments and material to which Mr. Williams deliberately exposed Ms. Smith from approximately August 2019 through December 30, 2019. Moreover, by the end of December and immediately before Ms. Smith's January 10, 2020 Resignation Notice, Mr. Williams's alleged sexual harassment reached a crescendo.  On December 6, 2019, Mr. Williams began the month by showing Ms. Smith a video of partially clothed women with one spanking the other.   On December 17, he divulged to her his diagnosis of vitiligo on his penis (in the form of a penis no less).  Days later on December 19, he continued revealing himself to her by showing her a cellphone picture of what she believed was his erect penis. This theme continued when, on December 20, he again showed her a picture she believed captured his discolored penis wedged into a cake.  On December 23, Mr. Williams reached a new height of vulgarity by exposing Ms. Smith to a video of two women engaged in oral sex.  Finally, on December 30, Mr. Williams had

61

created such an intolerable work environment for Ms. Smith that she reacted to a third sexually explicit video forced upon her by Mr. Williams that month by verbally rebuking him.  Mr. Williams responded to Ms. Smith's negative reaction by sending her a text message with images of guns and ammunition and with no other explanation than the names of the firearms.

Ms. Smith then sought but received no assistance from HR.  On January 2, 2020, she reported Mr. Williams's now utterly intolerable behavior to Eagles Landing's HR director, Ms. Bailey.  However, rather than attempt to improve Ms. Smith's work environment, on January 7, Ms. Bailey cemented her untenable position by explaining to Ms. Smith that she "was afraid to get involved with addressing . . . CEO [ Williams]'s misconduct out of fear of losing her job too because she had no other place to go for work."  (Second Smith Decl. ¶ 29; see also PSAF ¶ 25.)  A jury could find that any reasonable person in Ms. Smith's circumstances would be compelled to resign.

Furthermore, while a resignation letter thanking the employer weighs against a conclusion of intolerable working conditions and forced resignation, Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1284 (11th Cir. 1999) (per curiam) (resignation letter thanking employer does not support conclusion the plaintiff was forced to resign), Ms. Smith did no such thing in her January 10, 2020 Resignation

62

Notice.  Rather, Ms. Smith's email references her need to "draw strength" from her roots, the need to prepare herself for "an emotional journey," her attempts to make "a positive difference" at Eagles Landing, and "hiccups" that happened along the way.  (See Pl.'s Mot. Summ J. Ex. C [86-5], at 2.)  Ms. Smith ends her letter with advice for her team to communicate, help each other, and lead by example, and adds a prescient closing reminder to the group recipients (which included Mr. Williams) that "[p]eople may forget what you said and did, but people will never forget how you made them feel."  (Id.)

Based on the above record, a reasonable jury could find that via Mr. Williams's deliberate efforts, sexually-explicit content so pervaded Ms. Smith's work environment that it was utterly intolerable for her and that by December 30, 2019 it had deteriorated to such a degree that she had no choice but to resign. Accordingly, the undersigned **RECOMMENDS** that Defendants' Motion for Summary Judgment be **DENIED** as to Ms. Smith's claim of constructive discharge set forth in Count III.

### D.    Ms. Smith's IIED Claim (Count IV)

Georgia courts have "recognized [that] discriminatory, retaliatory or harassing conduct may form the basis of an intentional infliction of emotional distress claim." Canty v. Fry's Elecs., Inc., 736 F. Supp. 2d 1352, 1380 (N.D. Ga.

63

2010).  To support an IIED claim under Georgia law, a plaintiff must establish four elements:  (1) the conduct was intentional or reckless; (2) the conduct was extreme or outrageous; (3) there is a causal connection between the wrongful conduct and the plaintiff's emotional distress; and (4) the emotional distress was severe.  Metro. Atlanta Rapid Transit Auth. v. Mosley, 634 S.E.2d 466, 470 (Ga. Ct. App. 2006); Bridges v. Winn-Dixie Atlanta, Inc., 335 S.E.2d 445, 447-48 (Ga. Ct. App. 1985).

"Liability for intentional infliction of emotional distress has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  Hodor v. GTE Mobilnet, Inc., 535 S.E.2d 300, 302 (Ga. Ct. App. 2000) (internal quotations omitted) (quoting Jarrard v. United Parcel Serv., Inc., 529 S.E.2d 144, 147 (Ga. Ct. App. 2000)).  "[M]ere tasteless, rude or insulting social conduct will not give rise to such a claim."  Troncalli v. Jones, 514 S.E.2d 478, 483 (Ga. Ct. App. 1999) (internal quotation marks and citation omitted).  Whether conduct is "sufficiently extreme or outrageous to support recovery is a question of law for the trial court.  Factors include the existence of a relationship in which one person has control over another; the actor's awareness of the victim's particular susceptibility; and the severity of

64

the resultant harm." <u>Trimble v. Cir. City Stores, Inc.</u>, 469 S.E.2d 776, 778 (Ga. Ct. App. 1996) (internal citations omitted).

Finally, a plaintiff must also be able to show that the emotional distress she suffered was extreme and "so severe that no reasonable man could be expected to endure it . . . . It is for the court to determine whether on the evidence severe emotional distress can be found." <u>Bridges</u>, 335 S.E.2d at 448 (<u>quoting</u> Restatement (Second) of Torts § 46(1) cmt. j (1965)); <u>see also</u> <u>Witter v. Delta Airlines, Inc.</u>, 966 F. Supp. 1193, 1201 (N.D. Ga. 1997) (alleged symptoms of emotional distress including anxiety, sleeplessness, overeating, diarrhea, and headaches, while not minor, clearly not of the type that no reasonable man could be expected to endure), <u>aff'd</u>, 138 F.3d 1366 (11th Cir. 1998).

Defendants argue that Mr. Williams's alleged conduct was not sufficiently extreme and outrageous to support an IIED claim.  (Defs.' Mem. [80-1] 22-25; Defs.' Reply [106] 19-20.)  Defendants even go so far as to characterize that conduct as merely sophomoric.  (Defs.' Reply [106] 20.)

Certainly, defendants are correct that Mr. Williams's intentional conduct lacked maturity, taste, and judgment.  However, a reasonable jury also could conclude that the conduct summarized <u>supra</u> Parts III.A-C—detailed descriptions of sex acts, numerous sexually explicit videos and pictures (including two

potentially of Mr. Williams himself), and a veiled threat of gun violence, which CEO Williams sprung upon his direct report while she was alone in his closed office—so breached the bounds of decency as to be considered atrocious and intolerable in civil society.  See Ferman v. Bailey, 664 S.E.2d 285, 291 (Ga. Ct. App. 2008) (finding evidence of pervasive pattern of harassing behavior (including physical assault and threat to kill) demonstrated extreme and outrageous conduct, especially given the defendant's ownership of the business and the control he exercised over the plaintiff employee); Simon v. Morehouse Sch. of Med., 908 F. Supp. 959, 972 (N.D. Ga. 1995) (finding lewd and vulgar comments, sexual advances, touching, and rape sufficiently extreme and outrageous as to state an IIED claim).

Additionally, as reasonable jury could find that Mr. Williams was aware that his conduct upset Ms. Smith (who would put her head in her hands or her hands over her ears, or say, "Lord help me," "Oh, my God," or "I don't need to hear that"), given that he appeared to find her reactions humorous.  (See Smith Dep. [84-1] 286; see also PSAF ¶ 19.)  Likewise, a reasonably jury could find Ms. Smith's diagnosis of shingles and PTSD and continuing need for psychiatric treatment and therapy indicative of severe emotional distress resulting from Mr. Williams's conduct.

66

Under the above circumstances, the undersigned **REPORTS** that Mr. Williams's alleged conduct is sufficiently extreme and outrageous to support recovery for Ms. Smith's alleged extreme emotional distress. Accordingly, the undersigned **RECOMMENDS** that Defendants' Motion for Summary judgment as to Ms. Smith's IIED claim set forth in Count IV be **DENIED**.

Additionally, given that the undersigned recommends Defendants' Motion for Summary Judgment be denied as to all of Ms. Smith's substantive claims (see supra Parts III.A-D), there is no basis for dismissing her claim for punitive damages against Mr. Williams. Accordingly, the undersigned also **RECOMMENDS** that Defendants' Motion to Dismiss be **DENIED** as to Count V of the Complaint.

## IV.   PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Ms. Smith seeks an entry of summary judgment on Eagles Landing's counterclaim for breach of Section 2 of the PCA. (Pl.'s Mot. Summ. J. [86]; Defs.' Answer & Countercl. [10] ¶¶ 16-21, at 18-19.) Ms. Smith argues that Section 2 is an unenforceable restraint of trade; that Eagles Landing waived any claim arising from her private CPA business because its co-owners regularly engaged her services personally and referred others to her; that Mr. Williams modified the PCA by allowing her to work remotely and part-time; that, regardless, there is no evidence she breached Section 2; and that the Court cannot award attorney's fees

and costs under Section 8(a) of the PCA because it does not apply to the provision at issue.  (Pl.'s Mem. [86-1] 1-2.)  The Court addresses those issue in turn.

## A.    The Enforceability of Section 2's Restrictive Covenant

Ms. Smith argues that Eagles Landing's counterclaim fails as a matter of law because Section 2 of the PCA is overbroad and therefore an unenforceable restraint of trade under O.C.G.A. § 13-8-53 (governing restrictive covenants in contracts) and state common law.   (Pl.'s Mem. [86-1] 7-8; Pl.'s Reply [108] 2-4.) Additionally, she contends that Eagles Landing failed to plead the existence of a legitimate business interest served by the PCA's requirement set forth in Section 2 that she devote "substantially all" of her "business effort, time, energy, and skill" to her duties, while also restricting her from "engag[ing] in or provid[ing] services to any other business or enterprise (whether engaged in for profit or not)."  (Pl.'s Mem. [86-1] 9 (quoting PCA [86-3] 3).)

Eagles Landing argues that the Georgia Restrictive Covenants Act of 2011 ("GRCA"), O.C.G.A. §§ 13-8-50 to -59, does not prohibit contract provisions which restrict activities during employment, such as Section 2 of the PCA.  (Defs.' Resp. [95] 9.)  Moreover, it contends that Section 2 is not unreasonable under the Act even if it lacks any specific limitation on the scope of activity, duration, or geographic area, so long as it promotes the purpose or subject matter of the

agreement or relationship or deters potential conflicts of interest. (Id.) Eagles Landing asserts that Section 2 clearly promotes and protects the employment relationship between the parties and Section 1(b) of the PCA sets forth the legitimate business interests protected by the agreement. (Id. at 9-10, 10 n.1.)

Eagles Landing also contends that Section 2's requirement that Ms. Smith only "devote 'substantially all of . . . her business effort, time, energy, and skill'" to her duties is significantly less restrictive than the covenants at issue in her cited caselaw—Early v. MiMedx Group, Inc., 768 S.E.2d 823 (Ga. Ct. App. 2015) (holding covenant requiring a consultant "devote her full working time" to the performance of her duties was unenforceable), and Pan Am Dental, Inc. v. Trammell, No. CV418-288, 2020 WL 2531622 (S.D. Ga. May 18, 2020) (holding covenant requiring contractor "devote . . . entire working time" to promote the employer's sales was overbroad). (Defs.' Resp. [95] 10.) Defendants argue that, unlike the clauses in those cases, Section 2 of the PCA did not require Ms. Smith to spend all of her time on her work duties; therefore, it is reasonable in scope and reasonably promotes Eagles Landing's relationship with its Controller—a legitimate business interest. (Id. at 10-11.) Eagles Landing also observes that Ms. Smith was the highest ranking employee in the accounting/finance department and thus owed it a duty of loyalty, which included devoting sufficient time to properly

69

carry out her duties, unlike the independent contractors in <u>Early</u> and <u>Pan Am</u>.  (<u>Id.</u> at 11.)

Eagles Landing does not construe Section 2 to prevent Ms. Smith from engaging in <u>any</u> outside business, including her own CPA business, but only expected that she would meet her obligations without requiring it to pay for unnecessary temporary employees, costly project delays, and corrections to payroll issues.  (Defs.' Resp. [95] 12.)  Defendants assert that provisions like Section 2 are regularly enforced in other jurisdictions and, if it is found unenforceable, they invite the Court to modify that provision to protect Eagles Landing's interest in preventing Ms. Smith from supporting other businesses at the expense of her obligations to it.  (<u>Id.</u> at 12, 12 n.2.)

### 1.    GRCA Applies to Section 2 of the PCA

On May 31, 2016, the parties entered into the PCA.  (<u>See generally</u> PCA [86-3].)  Thus, the enforceability of any restrictive covenants in that contract is governed by the GRCA.[42]  The GRCA defines "restrictive covenant" as

––––––––––––––––––––

[42] The GRCA became effective May 11, 2011, and applies to contracts issued after that date.  To the extent that Section 2 is a restrictive covenant (a term synonymous with restraint of trade), the Court must apply the GRCA and not Georgia's pre-2011 common law of restrictive covenants.  <u>See</u> <u>Fortress Inv. Grp., LLC v. Holsinger</u>, 841 S.E.2d 55, 60-61 (Ga. Ct. App. 2020).

> an agreement between two or more parties that exists to protect the first party's or parties' interest in property, confidential information, customer good will, business relationships, employees, or any other economic advantages that the second party has obtained for the benefit of the first party or parties, to which the second party has gained access in the course of his or her relationship with the first party or parties . . . .

O.C.G.A. § 13-8-51(15).

Section 13-8-53(a) of the GRCA permits enforcement of contracts that restrict competition during the contract term "so long as such restrictions are reasonable in time, geographic area, and scope of prohibited activities." O.C.G.A. § 13-8-53(a).[43] Any restrictive covenant not in compliance with that section is void and unenforceable; although, "a court may modify a covenant that is otherwise void and unenforceable so long as the modification does not render the covenant more restrictive with regard to the employee than as originally drafted by the parties." Id. § 13-8-53(d).[44]

———————————

[43] Whether a restrictive covenant is reasonable is generally a question of law for the court. Becham v. Synthes USA, 482 F. App'x at 387, 393 (11th Cir. 2012) (per curiam) (citing Orkin Exterminating Co. v. Walker, 307 S.E.2d 914, 916 (Ga. 1983)).

[44] It is within the Court's discretion to determine whether to "blue-pencil" a contract. Belt Power, LLC v. Reed, 840 S.E.2d 765, 770 (Ga. Ct. App. 2020) ("may" indicates the provision is discretionary and trial court did not abuse its discretion when it declined to modify restrictive covenants to make them enforceable). "Though courts may strike unreasonable restrictions, and may narrow over-broad

71

The GRCA also provides that any restrictive covenant that limits competition during or after the term of an employment relationship "shall not be considered unreasonable because it lacks any specific limitation upon scope of activity, duration, or geographic area so long as it promotes or protects the purpose or subject matter of the agreement or relationship or deters any potential conflict of interest."   O.C.G.A. § 13-8-56(4).   Finally, courts should construe restrictive covenants "in favor of providing reasonable protection to all legitimate business interests established by the person seeking enforcement."   Id. § 13-8-54(a).   "The person seeking enforcement of a restrictive covenant shall plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant."   Id. § 13-8-55.

Here, the parties dispute whether the PCA's Section 2 requirements that Ms. Smith "devote substantially all of []her business effort, time, energy, and skill . . . to fulfill []her employment duties" and that she "not be engaged in or provide services to any other business or enterprise (whether engaged in for profit or not)

_____

territorial designations, courts may not completely reform and rewrite contracts by supplying new and material terms whole cloth."   LifeBrite Labs., LLC v. Cooksey, No. 1:15-CV-4309-TWT, 2016 WL 7840217, at *7 (N.D. Ga. Dec. 9, 2016) (referring to Hamrick v. Kelley, 392 S.E.2d 518 (Ga. 1990)).

which interferences with []her obligations to [Eagles Landing]" constitute restrictive covenants governed by the GRCA.

The undersigned **REPORTS** that Section 2 is a restrictive covenant as defined by O.C.G.A § 13-8-51(15) because it protects Eagles Landing's interest in confidential information, good will, and business relationships created by and/or obtained by Ms. Smith to benefit Eagles Landing.   (See PCA [86-3] 2 (acknowledging Ms. Smith's access to confidential information that would materially harm Eagles Landing if it was disclosed or used in violation of the PCA).)  Thus, the Court must determine whether the provisions at issue in Section 2 of the PCA are enforceable under the GRCA.

### 2.    Section 2 of the PCA is Unenforceable

As an initial matter, Ms. Smith correctly observes that Eagles Landing's counterclaim fails to plead what legitimate business interests Section 2 of the PCA protected, as required by O.C.G.A. § 13-8-55.  (See generally Defs.' Answer & Countercl. [10] ¶¶ 1-21, at 15-19.)  Indeed, rather than citing to its counterclaim to establish compliance with the GRCA's pleading requirement, Eagles Landing simply argues in its response brief that Section 2 promoted and protected its employment relationship with Ms. Smith and ensured she would not be an absentee employee whose outside business interests interfered with her duties as Controller.

(Defs. Resp. [95] 10 n.1.)  Eagles Landing also points to Section 1(b) of the PCA in its response brief.  (Id.)

It is well established, however, that a pleading cannot be amended via a brief. Gilmour, 382 F.3d at 1315 ("A plaintiff may not amend her complaint through argument in brief opposing summary judgment.").  Thus, Eagles Landing's counterclaim for breach of Section 2's restrictive covenants must be dismissed as a matter of law for failure to comply with O.C.G.A. § 13-8-55.  See Richard E. Kaye, J.D., 36 Causes of Action 2d 103, Appx. § 63, ¶ 8 (May 2022) (sample complaint to enforce restrictive covenant, including description of the employer's protectable interest).  Nevertheless, even assuming Eagles Landing's counterclaim had sufficiently pled one or more legitimate business interests that justified Section 2's restrictive covenants, those provisions are unenforceable under the GRCA for the reasons set forth below.

Section 2 restricted "substantially all" of Ms. Smith's activities—meaning the PCA restricted a "considerable" or "significantly great" amount of her activities and "largely but not wholly" all of her business efforts, time, energy, and skill.  See Substantial, Merriam-Webster's Collegiate Dictionary (10th ed. 1993).  Section 2 also prevented Ms. Smith from engaging in or providing services to any other business or enterprise that interfered with her employment duties—which under the

74

PCA occupied all but an insignificant amount of her activities.  (PCA [86-3] 3.)
Therefore, as written, Section 2 largely restricted Ms. Smith's use of her business
efforts, time, energy, skill, and services without meaningful limitations in time,
area, or scope of prohibited activities, as required by O.C.G.A. § 13-8-53(a).

Eagles Landing's argument that the PCA's terms differ significantly from
the unenforceable restrictive covenants in Early and Pan Am (considered overbroad
under Georgia's common law and the GRCA, respectively) is simply without merit.
There is no significant difference between the instant language requiring Ms. Smith
to "devote substantially all" her time to her employment duties and the
unenforceable covenants in Early, which required the consultant's employee to
"devote her full working time" to the performance of her duties, and in Pan Am,
which required the contractor to devote his "entire working time" to sales for his
employer.[45]  That the PCA leaves Ms. Smith a sliver of insubstantial time to devote

---

[45] Eagles Landing's argument that Ms. Smith's status as an employee, rather
than a contractor, places her in a different position than the contractors in Early and
Pan Am is without merit.  (Defs.' Resp. [95] 11.)  Notably, in Early, the Georgia
Court of Appeals specifically stated that restrictive covenants ancillary to
employment contracts for services by either independent contractors or employees
are treated the same.  768 S.E.2d at 829 n.12.

to any business endeavor outside of her duties for Eagles Landing hardly makes Section 2's restrictions reasonable in time, area, or scope.

Moreover, Section 2's restrictions cannot be presumed reasonable under the GRCA because they do not comply with O.C.G.A. § 13-5-56(4)'s requirement that restrictive covenants not limited by scope, duration, or area, must promote or protect the purpose or subject matter of the agreement or relationship or deter any potential conflict of interest. Here, Section 2 applied to Ms. Smith's outside activities regardless of whether or not they interfered with her role as Eagles Landing's Controller (or her attendance in general) and regardless of whether her outside activities violated Eagles Landing's interest in confidentiality, took advantage of its good will or business relationships, or otherwise competed with the practice or posed a potential conflict of interest. Furthermore, Eagles Landing's assertion that it is not attempting to enforce Section 2 in a way that would prevent Ms. Smith from performing any other outside work is irrelevant to interpretation of the contract terms at issue. See Triple Eagle Assocs. v. PBK, Inc., 704 S.E.2d 189, 195-96 (Ga. Ct. App. 2010) ("[W]here the terms of a written contract are plain and unambiguous, a court must confine itself to the four corners of the document to ascertain the parties' intent, and is not permitted to strain the construction of [a

76

contract,] so as to discover an ambiguity." (internal quotation marks and footnote omitted)).[46]

Thus, the undesigned **REPORTS** that the terms at issue set forth in Section 2 of the PCA are restrictive covenants governed by the GRCA; that Eagles Landing failed to comply with the GRCA's pleading requirements; and that, regardless, those terms are unreasonable (and therefore unenforceable) under the Act because they are broader than necessary to promote or protect Eagles Landing's interest in Ms. Smith's performance as its Controller, to prevent Ms. Smith from being an absentee employee, and to deter potential conflicts of interest. Additionally, those restrictions, which ended with Ms. Smith's resignation, do not lend themselves readily to revision under the circumstances. Furthermore, Eagles Landing is a sophisticated entity and the Court should decline to remake Section 2 on its behalf.

Accordingly, the undersigned **RECOMMENDS** that the Court **GRANT** summary judgment to Ms. Smith as to Eagles Landing's counterclaim for breach of the PCA. In the interest of providing the Court with a thorough Report and

---

[46] The Court need not accept Eagles Landing's invitation to rely on cases from Texas and New York courts purportedly enforcing similar provisions to find Section 2 enforceable, as those cases are not controlling and largely not on point. (See Defs.' Resp. [95] 12.)

Recommendation, the undersigned addresses the parties' arguments regarding waiver of Section 2's restrictions and the enforceability of those terms if the GRCA is inapplicable.

## B.      Eagles Landing Waived Section 2's Requirements

In the alternative, Ms. Smith contends that Eagles Landing waived its right to enforce Section 2 as to her CPA business because CEO Williams and Dr. Steele (married co-owners) engaged her services for their personal needs and referred others to her business since 2017.  (Pl.'s Mem. [86-1] 11.)  Ms. Smith argues that Eagles Landing's co-owners cannot personally use her services and refer others to her for services outside of her employment and then maintain that such services breached her duties to Eagles Landing.  (Id. at 13.)[47]

Eagles Landing argues that Ms. Smith's assertion that it waived her compliance with Section 2 of the PCA is flawed because that argument requires the provision be interpreted as prohibiting her from engaging in any separate CPA

---

[47] The undersigned does not address Ms. Smith's argument that she had an oral agreement with Mr. Williams which modified her contract (i.e., changing her status to part-time and reducing her pay) because he disputes the contents of their conversation and the Court must view the facts in the light most favorable to Eagles Landing when ruling on plaintiff's Motion for Summary Judgment.  (See Pl.'s Mem. [86-1] 14-15; Pl.'s Reply [108] 6-8.)

practice.  (Defs.' Resp. [95] 16.)   Rather, Eagles Landing emphasizes that Ms. Smith was only restricted from engaging in her CPA practice to the extent it interfered with her employment obligations.  (Id.)  In that regard, Eagles Landing contends that Mr. Williams's referral of others to Ms. Smith for "one-off" tax advice does not mean that Eagles Landing released her from any contractual obligations.  (Id. at 16-17.)  Eagles Landing insists that it did not discover Ms. Smith's breaches of the PCA until after she resigned in January 2020, and she should not now be permitted to assert waiver because she was able to conceal her lack of devotion under the guise of wanting to work from home.  (Id. at 17.)

"It is well established that a party to a contract may waive a contractual provision for his or her benefit."  Forsyth Cnty. v. Waterscape Servs., LLC, 694 S.E.2d 102, 109 (Ga. Ct. App. 2010) (citation omitted).  Moreover, waiver may be "express, or may be inferred from actions, conduct, or a course of dealing."  Smith v. Gordon, 598 S.E.2d 92, 93 (Ga. Ct. App. 2004).  For example, as the Georgia Court of Appeals explained in Forsyth County,

> Waiver of a contract right may result from a party's conduct showing his election between two inconsistent rights.  Acting on the theory that the contract is still in force, as by continuing performance, demanding or urging performance, or permitting the other party to perform and accepting or retaining benefits under the contract, may constitute waiver of a breach.

694 S.E.2d at 109-10.  However, "[u]nder Georgia law, waiver is a matter of intent: the evidence must so clearly indicate an intent to relinquish a known right as to exclude any other reasonable explanation."  Allstate Fin. Corp. v. Dundee Mills, Inc., 800 F.2d 1073, 1075 (11th Cir. 1986).

Here, Mr. Williams, as CEO of Eagles Landing, signed the PCA and had direct knowledge of Section 2's requirements that Ms. Smith devote to Eagles Landing substantially all her business effort, time, energy, and skill, and not be engaged in another business which interfered with her duties.  (See PCA [86-3].) Despite knowledge of that provision, CEO Williams and Dr. Steele received personal tax advice from Ms. Smith and asked her to answer tax questions for their nannies.  Indeed, in his deposition, Mr. Williams expressed his belief that Ms. Smith properly could assist persons affiliated even tangentially with Eagles Landing.  (Williams Dep. [84-2] 233-36.)  Thus, the undisputed evidence clearly establishes CEO Williams's intent to relinquish Eagles Landing's right to enforce Section 2 by expecting Ms. Smith to actively provide private tax advice and services to his family and others linked to Eagles Landing while maintaining her role as its Controller.

Moreover, according to Eagles Landing, Section 2 allowed Ms. Smith some amount of time to engage in outside business.  Therefore, over the course of 2019,

she could reasonably devote 20 hours of work to a single non-Eagles Landing client, make 2 phone calls related to her business, send 2 emails recruiting assistants, order a logo, and take out an advertisement without violating Section 2's requirements. Eagles Landing cannot supply Ms. Smith with distractions from her official duties, while pointing to her other minor outside business activities and claim that only those unaffiliated activities prevented her from devoting substantially all her business efforts to it and interfered with her obligations as Controller.

Furthermore, Mr. Williams's testimony regarding his personal observations of Ms. Smith's blatant absenteeism and poor performance between March 2019 and January 2020 belies Eagles Landing's argument that the Court should not permit Ms. Smith to benefit from concealing her lack of devotion to the practice. Rather, there is no other reasonable explanation for CEO Williams's continued course of conduct in maintaining Ms. Smith as Controller and using her for outside services (in addition to referring others to her) but that Eagles Landing waived Section 2 for its benefit and his.

Accordingly, the undersigned **REPORTS** that, should the Court deem Section 2 of the PCA enforceable, Eagles Landing waived Ms. Smith's compliance with that provision in 2019. On that additional basis, the undersigned **RECOMMENDS** the Court **GRANT** summary judgment to Ms. Smith on Eagles

81

Landing's counterclaim for breach of the PCA.  To provide the Court with a thorough Report and Recommendation, the undersigned next addresses whether Eagles Landing has established that Ms. Smith breached any remaining enforceable duties she owed it under Section 2.

## C.    Eagles Landing's Allegations of Breach Fail

Ms. Smith denies breaching Section 2 by failing to devote "substantially all" of her business time and effort to Eagles landing, asserting that she devoted all but 20 hours of her 2019 business time to Eagles Landing (excluding matters she handled for persons linked to it) and only generated $150 in income from her separate CPA business.  (Pl.'s Mem. [86-1] 16-17; Pl.'s Reply [108] 10.)  Similarly, she denies responsibility for the alleged payroll errors, temporary staff costs, and delays associated with an integration project by outside accounting firm Bennett Thrasher.  (Pl.'s Mem. [86-1] 18-24; Pl.'s Reply [108] 11-13.)  In her Reply, Ms. Smith also contends that Georgia common law does not recognize a breach of contract claim for poor performance by an at-will employee, who can be terminated at any time.  (Pl.'s Reply [108] 14-15.)

Assuming Section 2 is enforceable, Eagles Landing argues that material fact disputes remain with regard to Ms. Smith's alleged breaches of the PCA, each of which prevent entry of summary judgment in her favor.  (Defs.' Resp. [95] 13.)

82

Eagles Landing alleges Ms. Smith caused it financial loss by her inattention to payroll; failing to be present in its offices—causing a decline in her performance; delaying a project with Bennett Thrasher; and abusing her authority to engage temporary workers in the accounting department.  (Id. at 14-16.)

Given that the PCA's restraint on Ms. Smith's "business effort, time, energy, and skill" is unenforceable (see supra Parts IV.A-B), Eagles Landing's claim of breach rests on the agreement's requirement that she "faithfully, loyally and diligently perform [her] duties."  (PCA [86-3] 3; see also Defs.' Answer & Countercl. [10] ¶¶ 18-20, at 18-19.)  Essentially, Eagles Landing seeks to sue Ms. Smith for disloyalty and poor job performance.

First, Eagles Landing's claim that it can hold Ms. Smith liable for breaching the duty of loyalty fails as a matter of law.  It is well-established under Georgia law that "'a cause of action against an [at-will] employee for breach of loyalty must be based upon a fiduciary duty owed by the employee and must rise and fall with any claim for breach of fiduciary duty.'"  Tolson Firm, LLC v. Sistrunk, 789 S.E.2d 265, 268 (Ga. Ct. App. 2016) (quoting Physician Specialists in Anesthesia, P.C. v. Wildmon, 521 S.E.2d 358, 362 (Ga. Ct. App. 1999)).  Permitting such a claim against an at-will employee, who can be terminated for any or no reason, would create an unfair and unjust advantage for employers.  Id.  Moreover, in Georgia,

83

"[i]t is well settled that an employee does not breach a fiduciary duty to its employer by making plans to compete, even if those plans are made while the employer-employee relationship still exists." Hanson Staple Co. v. Eckelberry, 677 S.E.2d 321, 323 (Ga. Ct. App. 2009).

There is no evidence that Ms. Smith was a fiduciary of Eagles Landing, nor does it argue as much. It is undisputed that Ms. Smith, despite being the only CPA at the practice and highest ranking employee of the accounting department, was a mere at-will employee working under the supervision of CEO Williams and was not an agent of Eagles Landing who owed it a fiduciary duty. Because Eagles Landing has failed to allege or establish that Ms. Smith owed it a fiduciary duty, its claim that she breached the attendant duty of loyalty fails as a matter of law.

Second, Georgia law does not recognize a claim for poor job performance. Tellingly, Eagles Landing does not cite to a case supporting such a claim against an employee similarly situated to Ms. Smith. This is because termination is the proper recourse for an employer faced with an at-will employee who fails to come to the office, fails to respond satisfactorily to the CEO, and suffers a decline in performance. Both the PCA and Georgia law provide for at-will employment, meaning that Eagles Landing could have terminated Ms. Smith at any time for any reason or no reason at all.

84

Indeed, terminating Ms. Smith at some point during the alleged 10-month decline in her performance was the obvious course of action given Mr. Williams's description of her open and obvious failings between March 2019 and her January 2020 resignation, which included:  arriving at the HR department at 6:30 p.m. on payroll days suspiciously dressed in business casual attire; increasingly abandoning Eagles Landing while she primarily worked from home between March and September 2019, so much so that Mr. Williams requested she return to the office in October 2019; being difficult to contact during normal work hours; consistently skipping or cancelling internal meetings or asking that they be reduced to phone calls; being unavailable to Bennett Thrasher for weeks at a time, resulting in unnecessary fees for delayed projects; and engaging temporary workers in the accounting department, presumably to perform her work.  (Defs.' Resp. [95] 14-15.)  That Mr. Williams had personal knowledge of Ms. Smith's alleged excessive absenteeism, belies Eagles Landing's claim that it could not have discovered her breach until after she resigned.  (See Williams Decl. [96-2] ¶ 12 ("After our conversation in March of 2019, Ms. Smith soon stopped coming to the office altogether, and I did not see Ms. Smith in [Eagles Landing's] offices . . . on a regular basis, although my office was near hers and I was generally in the office in 2019.").)

Oddly, Eagles Landing retained Ms. Smith rather than simply exercising its readily available recourse—termination.  That Eagles Landing declined to avail itself of that right and continued to employ Ms. Smith despite her absenteeism and inaccessibility does not give it a claim against her for poor performance.  Moreover, what Ms. Smith did outside of work to interfere with the performance of her duties is immaterial; rather, her satisfactory or unsatisfactory performance is the only indicator Mr. Williams required to determine whether to retain or terminate her.  Eagles Landing cannot now recoup for financial losses that accumulated from March 2019 through January 2020, when it could have prevented or limited those losses by terminating Ms. Smith at any point during that 10-month period.  As the Georgia Court of Appeals explained in <u>Tolson Firm, LLC</u>, permitting such a claim against an at-will employee who can be terminated at any time would create an unfair and unjust advantage for employers.  789 S.E.2d at 268.

For the reasons set forth above and <u>supra</u> Parts IV.A-C, the undersigned **REPORTS** that Eagles Landing's counterclaim against Ms. Smith for breach of the PCA fails as a matter of law and, alternatively, that Eagles Landing waived performance of Section 2.  Accordingly, the undersigned **RECOMMENDS** that Ms. Smith's Motion for Summary Judgment [86] be **GRANTED** and Eagles Landing's counterclaim be **DISMISSED WITH PREJUDICE**.

86

Despite the above dispositive findings, in order to provide a thorough Report and Recommendation the undersigned continues the analysis of Eagles Landing's counterclaim by addressing its request for attorney's fees pursuant to Section 8 of the PCA.  (See Defs.' Answer & Countercl. [10] ¶ 21, at 19.)

### D.     Fee-Shifting Under Section 8(a) of the PCA

Ms. Smith asserts that Eagles Landing's counterclaim for attorney's fees pursuant to Section 8(a) of the PCA fails as a matter of law because it does not seek to enforce any of the defined "Protective Covenants," as required for recovery under that provision.  (Pl.'s Mem. [86-1] 24-25.)

Eagles Landing contends that Ms. Smith "seeks to have it both ways, arguing that Section 2 of the PCA both is, and is not, a restrictive covenant to be enforced." (Defs. Resp. [95] 16 n.3.)   It suggests that the Court can ignore the specific definition assigned by the PCA to the term "Protective Covenant" as used therein and instead broaden the meaning of that term to include the definition of a protective covenant set forth in the case law cited by Ms. Smith.  (Id.)  Eagles Landing also asserts that its counterclaim serves as an enforcement action.  (Id.)

Eagles Landing's counterclaim for attorney's fees pursuant to Section 8(a) of the PCA fails as a matter of law.  (See Defs.' Answer & Countercl. [10] ¶ 21, at 19.)  That clause of the contract only grants Eagles Landing the right (outside of

87

any remedies at law or equity) to recover reasonable costs and attorney's fees incurred in enforcing the PCA's "Protective Covenants," specifically defined by the terms of the contract as "Sections 4 through 7" therein.  (PCA [86-3] 4-9.) Because Eagles Landing seeks enforcement of Section 2, it cannot avail itself of Section 8(a)'s fee shifting provision.  Accordingly, the undersigned **REPORTS** that the Court must **GRANT** Ms. Smith's Motion for Summary Judgment as to Eagles Landing's request for costs and fees pursuant to Section 8(a) of the PCA.

## V.     CONCLUSION

For the reasons set forth above, the undersigned **RECOMMENDS** that Defendants' Motion for Summary Judgment [80] be **DENIED** as to all of Ms. Smith's claims and Counts I through V proceed to trial.

The undersigned **FURTHER RECOMMENDS** that Plaintiff's Motion for Summary Judgment [86] be **GRANTED** and Eagles Landing's counterclaim for breach of the PCA be **DISMISSED WITH PREJUDICE**.

The Clerk is **DIRECTED** to terminate the reference to the undersigned Magistrate Judge.

**SO RECOMMENDED**, this 14th day of July, 2022.


WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE
88